# WILLIAM KAHUI UUKU *v.* ELIZABETH KAIO AND ELSIE KAPU.

ERROR TO CIRCUIT COURT, FIRST CIRCUIT.

ARGUED OCTOBER 20, 1913.        DECIDED NOVEMBER 5, 1913.

ROBERTSON, C.J., PERRY AND DE BOLT, JJ.

EVIDENCE—*pedigree—sufficiency to sustain verdict.*

Upon an issue as to whether P and I, now dead, were half brothers, the plaintiff's proof consisted solely of the hearsay testimony of witnesses who claimed to have been told by P, I and K, the latter a brother of I, that P and I were half brothers. The testimony of these witnesses was such as to permit reasonable men to doubt its truth. For the defendants some witnesses who were members of the family of I and K and others who though not thus related were so situated as naturally to have heard of the alleged relationship if it existed, testified that at no time prior to the litigation had they heard that P was the half brother of I. Held, that a verdict that P was not the half brother of I was sustained by evidence.

TRIAL—*instructions—positive and negative testimony.*

An instruction that "all other things being equal, the witnesses of equal credibility, testimony of a positive character is more to be relied upon than testimony of a negative character" is correctly refused where it is unaccompanied by a specific statement of the circumstances under which the rule may be applied and is inapplicable to hearsay testimony admitted upon a question of pedigree.

NEW TRIAL—*newly discovered evidence—due diligence.*

A new trial will not be granted on the ground of newly discovered evidence where the movant might by the exercise of due diligence have discovered the proposed evidence before the trial.

Uuku v. Kaio, 21 Haw. 710.

Search for the evidence wherever there is a probability of finding it is essential to due diligence. The rule is especially applicable where there have been several trials.

In order to justify the granting of a new trial on the ground just stated it must appear that all of the attorneys who presented the movant's case at the past trials used such due diligence and that none of them were aware of the existence of the proposed evidence.

## OPINION OF THE COURT BY PERRY, J.

The plaintiff brought an action to quiet title, claiming an undivided one-eighth interest in fee simple in certain lands described in the declaration. The defendants denied that plaintiff had any title and the verdict and the judgment were for the defendants. Thereupon plaintiff sued out this writ of error.

At the trial now under review it was stipulated "that the plaintiff and the defendants both claim an interest in the lands described in plaintiff's complaint under the same source of title, to wit, as heirs of Isaac H. Kahilina, deceased; that the defendants claim an interest in the lands described in plaintiff's complaint as the heirs of Isaac H. Kahilina, deceased, by descent from said Isaac H. Kahilina; and that all of the lands described in plaintiff's complaint were at and before the death of Isaac H. Kahilina owned by him in fee simple." From undisputed evidence it further appeared that the defendants were the daughters of Kaukaha, the brother of Isaac Kahilina; that the parents of Isaac and Kaukaha were Kahilina, Senior, and Kenoi (w); and that the plaintiff was the son of Ana, one of the daughters of Paulo (k) and Ia (w). It was claimed by the plaintiff and not denied by the defendants that if Paulo was, as asserted by the plaintiff, the half brother of Isaac Kahilina the plaintiff was entitled to a verdict for an undivided one-eighth interest in the lands described in the declaration; and the sole issue of fact at the trial was whether Paulo was the half brother of Isaac, the plaintiff's claim upon this point being that Kahilina, Sr., was the second husband of Kenoi,

that the latter had a first husband named Kamahuula and that
Paulo was the son of Kenoi by Kamahuula.

The verdict shows that the jury found from the evidence
that Paulo was not the half brother of Isaac or at least that the
plaintiff did not prove to the satisfaction of the jury by a pre-
ponderance of the evidence that Paulo and Isaac were half
brothers.    It is assigned as error that the finding is contrary to
law, in that, as it is contended, the plaintiff's evidence was a
prima facie showing of the existence of the relationship and
that the defendants' proof did not rise beyond the dignity of a
"scintilla of evidence" of its non-existence.

Kenoi, Kahilina, Sr., Isaac, Kaukaha and Paulo were all
dead at the time of the trial.    Kamahuula, presumably, died
before Kenoi.    Testimony from any and all of these persons
was therefore unavailable.    So also the plaintiff did not pro-
duce any entries from a family Bible or from tombstones or
any other record evidence of a similar nature.    His case upon
the disputed question of fact rested wholly upon hearsay testi-
mony properly admitted under the well-known pedigree excep-
tion to the hearsay rule.    Six witnesses gave this testimony,
which was to the effect that on one or more occasions Paulo
or Kaukaha or Isaac, or more than one of them, as the case
might be, had stated to each of the witnesses that Kenoi, the
wife of Kahilina, Sr., had a first husband named Kamahuula
and that Paulo was the son of Kenoi by Kamahuula and there-
fore the half-brother of Isaac and Kaukaha.    In view of plain-
tiff's contention that the jurors were under a legal obligation
to accept this evidence as true and to return thereon a verdict
in his favor, some further reference to these witnesses and their
testimony will not be out of place.

Hana Scott and Puali Keawe were daughters of Paulo and
sisters of Ana, the plaintiff's mother.    Each testified that their
parents had six daughters, Hana, Puali, Ana, Maluae, Pouli
and Mahoe.    On cross-examination Hana admitted that some
years earlier at a judicial hearing concerning the administra-

tion of the estate of Isaac Kahilina she had "only mentioned three" daughters of her parents, explaining the former testimony by saying that four witnesses who had in that proceeding taken the stand before her had testified to three daughters only and that she (Hana) was excited and had "testified the same way" as the four witnesses. Isaac died in 1902; and yet Hana, who was born in 1867, admitted that she had once only visited at Isaac's. Puali likewise admitted that in the administration case she had testified that Paulo and Ia had only two children, giving as a reason for her testimony that she was excited; and defendants introduced in evidence an affidavit sworn to by Puali in 1905 in which the deponent said, inter alia, that "Paulo (k) married Ia (w) and two children were born by them, viz.: Hana (w) and Puali Keawe (w)." Puali, while testifying that Paulo had told her who his parents were, said that neither of her parents had ever told her the name of her maternal grandmother.

Uuku, the father of plaintiff, after stating that he had known Paulo and that he had heard that his wife, Ana, and Puali were related to Paulo, was asked, "What did he say about his relationship with these people" (meaning, clearly, Ana and Puali) "if anything?" and replied, "He said he had two brothers on Kauai." The answer was stricken out, by consent, because not responsive.

Mrs. Paookalani and Noa Kuiki were not related to any of the members of the family under consideration. Paoo thought he was related to some of them but far from clear as to what the relationship was. Noa on cross-examination testified that Isaac had told him that Kahilina, Sr., was the father of Paulo as well as of Kaukaha and Isaac, a claim in conflict with that presented by the testimony of four of the other witnesses called on plaintiff's behalf.

Paoo testified in his direct examination that Kaukaha told him that he had two brothers, Paulo and Isaac, and that Paulo told him that he had two brothers, Kaukaha and Isaac, but

upon cross-examination he admitted that, while he had been a
witness at two former trials in this case, he had not at the first
trial mentioned Kaukaha's alleged statement and had not at
the second trial spoken of Paulo's alleged statement.    He fur-
ther stated on cross-examination:    "I did not state that Kau-
kaha told me that he was related to Paulo"; and "all he said
was that I, the witness, was related to him." Asked on re-direct,
"Is it not true that upon some other occasion, some other time,
Kaukaha did say that Paulo was his brother ?" he answered:
"Yes, I did hear him say that on another occasion." Still later,
when plaintiff's attorney remarked to him, "Now, let's get the
truth of this thing" and asked, "Did Kaukaha ever, at any
time, any subsequent time, any time in your life, did Kaukaha
ever tell you or not, that Paulo was his older brother ?" the wit-
ness replied:    "At no time.    The only thing he said to me
was that I was related to them."

Mrs. Paookalani testified that Isaac told her that Paulo was
"his own older brother" and that Kaukaha told her that Paulo
was "his half brother through his mother."

There can be no doubt that if the jury had believed the testi-
mony of these six witnesses and had returned a verdict for the
plaintiff the verdict could not have been set aside on the ground
that it was unsupported by evidence; but the testimony was
not such as to require, as a matter of law, a verdict for the plain-
tiff.    As reasonable men actuated solely by a desire to arrive
at the truth and to render justice to both parties the jurors
could well have felt that the evidence of Hana and Puali was
tainted with some degree of improbability and that their failure
in their earlier statements under oath to disclose the fact of
the birth of six children to their parents rendered any reliance
on their evidence wholly unsafe.    They may well have been un-
favorably impressed with the undue eagerness of Uuku, Sr., to
place before the jury the information that Paulo had told him
that he (Paulo) had two brothers on Kauai.    Their confidence
in plaintiff's case may well have been lessened upon finding Noa

Kuiki and Mrs. Paookalani giving evidence tending to show that Paulo was the full brother of Isaac and Kaukaha, while the remaining four witnesses gave evidence tending to show that Paulo was a half brother only. And they may well have concluded that Paoo's testimony was too contradictory upon essential matters to permit of any credence being attached to it. Had the determination of the issue of fact rested solely upon a consideration of the plaintiff's evidence, the jury could reasonably have felt that they were not satisfied of its truth and that the plaintiff had not successfully borne the burden of proof cast upon him by law. There may be and doubtless are instances where a plaintiff's prima facie proof is such as not to admit, in the absence of evidence to the contrary, of an adverse verdict, but this is not a case of that nature.

Upon another ground, however, the verdict must be sustained and that is that the defendants' evidence was clearly sufficient to support it.

Hana Scott, daughter of Paulo, had testified, for the plaintiff, that at a certain luau and in the presence of Elizabeth Kaio, daughter of Kaukaha, Paulo had said that "if his mother had died in giving him, Paulo, birth, Mrs. Kaio never would have existed,"—another way of saying that Paulo's mother Kenoi was the mother of Kaukaha. Elizabeth, in the course of her testimony on her own behalf, denied absolutely that Paulo ever made that statement in her presence.

A brief statement of some of the remaining evidence adduced for the defense here follows:

Elizabeth Kaio was born in 1863 at Hanalei and lived with her parents till her death. She knew Isaac, lived at his home for one year after Kaukaha's death, and visited there at subsequent times. Her father kept a family Bible and in it made entries of births and deaths. (Leaves from this Bible were introduced at the trial but are not with the record now before us.) At no time prior to the commencement of this litigation did she hear from any member of the family or from any other

source that Paulo was the half brother of her father. None
of her family received letters or visits from Paulo.

J. A. Kaopuo was born in 1857 at Hanalei. His mother was
Paakii who after the death of his father married Kaukaha.
This witness lived in the same home with Elizabeth and her
mother for ten years before Kaukaha's death and for ten years
after that event and at no time heard in the family circle that
Isaac and Kaukaha had a half brother. During that period of
twenty years Paulo did not visit at the Kaukaha home.

Mary Kaiawe, whose mother's sister was the wife of Kau-
kaha, was born in 1855 and knew Kahilina, Sr., Isaac and Kau-
kaha and saw Paulo in Hanalei. She visited frequently at
Kahilina, Sr.'s, slept there and had meals there; also lived
there for a period of six or more years. Paulo when at Hana-
lei lived at the home of one Kealaiki and not at the Kahilina
home. Witness was a schoolmate of Maluae, daughter of Paulo.
Maluae lived at Kealaiki's. Witness never saw Maluae at the
Kahilina home and never heard from Isaac or Kaukaha that
Paulo was their half brother.

Kekahimoku, nephew of Kahilina, Sr., was born in 1832 and
moved to Kauai in 1857. He often visited at the Kahilinas in
Hanalei and would remain there for months at a time. Knew
Kenoi, Kaukaha and Isaac. Saw Kaukaha's dead body and was
present at Isaac's death. Never heard of Kamahuula or that
Kenoi had a first husband or a son Paulo or that Isaac and Kau-
kaha had a half brother.

Sam Kanewanui, administrator of Isaac's estate, established
a permanent home in Hanalei in 1876, the year after Kaukaha's
death. He married Loki, a daughter of Kaukaha's wife and
after his marriage lived in Kaukaha's home; witness knew Isaac
intimately until his death. Never heard from Isaac or in the
Kaukaha home that Paulo was a half brother.

J. S. Kaheleiki was born in 1835 and resided at Hanalei
from the fifties until the time of the trial. Lived "within
calling distance" of the Kahilina home. For years knew Isaac

and Kaukaha well.   Knew Maluae; she lived at Kealaiki's and witness never saw her at the Kahilinas'.   Never heard that Kenoi married Kamahuula or that Isaac and Kaukaha had a half brother.

S. W. Wilcox was born in Hanalei in 1847, lived there till 1872 and visited the place after that.   Was sheriff of Kauai from 1872 till 1895 or 1896.   Lived about one-half mile distant from home of Kahilina, Sr.   Knew Kaukaha and Isaac very well, was schoolmate of Kaukaha.   Isaac was district magistrate and a senator; Kaukaha practiced law and was a member of the legislature.   Both were prominent in the community. Never heard of their having a half brother.   Knew Maluae from childhood to womanhood.   She lived at Kealaiki's and witness never saw her at the Kahilina home.

A. S. Wilcox, born in 1844, spent much of his time in Hanalei from 1846 till 1877.   Knew Isaac and Kaukaha and was intimate with the latter in his later years.   Knew natives by the name of Paulo but never heard of any Paulo being half brother of Isaac and Kaukaha.   Neither Isaac nor Kaukaha ever referred to any half brother.

Counsel for plaintiff characterizes the testimony of these witnesses as being purely negative and as constituting at best a mere scintilla of evidence.   It cannot be so regarded.   It came, in the main, from persons who were either members of the Kahilina family or otherwise so situated as to have ample opportunity to learn of Paulo's relationship to Isaac and Kaukaha if it had existed.   Under the circumstances their failure to hear of a half brother may properly have been regarded by the jury as good cause for believing that none such ever existed,—at least it would justify a finding that plaintiff had not proven the alleged relationship by a preponderance of the evidence.

Elizabeth Kaio gave testimony which is construed by plaintiff's counsel as an admission that in 1906 she paid Hana and Puali the sum of $5500 for a conveyance of their interest in the property in question and therefore as a further admission

of title in the plaintiff.. The testimony referred to was not
direct or clear, but assuming that it was capable of the construc·
tion contended for its weight was nevertheless a matter for the
consideration of the jury. The issue was not whether Elizabeth
purchased the supposed interests of Hana and Puali but whether
Paulo was the half brother of Isaac. Moreover the purchase
of such an outstanding claim is not necessarily an acknowledg-
ment of title in another claimant. See *Smith* v. *Hamakua Mill
Co.,* 13 Haw. 716.

It is further assigned as error that the court refused to in-
struct the jury that "all other things being equal, the witnesses
of equal credibility, positive testimony on a given point must
always predominate over negative testimony on the same point;
testimony of a positive character is always more to be relied
upon than testimony of a negative character." Even if it were
otherwise unobjectionable, the instruction was correctly refused
because it was ambiguous and misleading. What meaning
would the phrase, "all other things being equal," convey to a
jury of laymen unaccustomed to analyzing the indicia of cred-
ibility and to the rules relating to the weighing of evidence ?
One prerequisite to the applicability of the instruction is stated,
to wit, that the witnesses must be of equal credibility; but the
other prerequisites are not defined. The relationship of the
witnesses to one or more members of the family, the degree of
intimacy of their acquaintance with Paulo, or with Isaac, or
with Kaukaha or Kenoi, their place of residence with reference
to that of the Kahilina family, their opportunities or lack of
opportunity for receiving information concerning the alleged
relationship between Paulo and Isaac, the probability or im-
probability of their hearing of the existence of the fact, if it
did exist,—none of these matters were mentioned to the jury
as necessary to be considered in determining whether "all other
things" were equal. Nor was it pointed out that the phrase had
no reference to the mere number of witnesses' testifying upon
a given subject.

It has been, indeed, declared in some cases that positive testimony is entitled to greater weight than that which is purely negative, the reasons given being, in substance that "it is possible to forget a thing that did happen and it is not possible to remember a thing that never existed" (*Stitt* v. *Huidekopers,* 17 Wall. 384, 394) and that "the negative witnesses may not have had their attention excited at the time." Where the reason for the rule does not exist, the rule itself does not apply. The same result follows where the evidence is not positive on the one hand or negative on the other within the meaning of the rule. The rule is "subject to so many exceptions as not to be of much practical use and if carelessly administered may work much mischief." *Smith* v. *McIlwaine,* 70 N. C. 287, 289. It does not apply to a case, like that at bar, where upon an issue of whether or not a certain relationship existed between two persons hearsay testimony is admissible. See *Wilson* v. *M'Ghee,* 4 Ky. 34, 35. The assertion by defendants' witnesses that they never heard from Isaac and Kaukaha that Paulo was Isaac's half brother is as truly positive as is the evidence of plaintiff's witnesses that they did hear the statements made by one or more of the parties named. If the defendants' witnesses had equal or better opportunities of information and if the jurors regarded them as in every way trustworthy and credible, then the very fact that no member of the Kahilina family ever made such a statement to any of defendants' witnesses might be in itself properly deemed by the jurors good ground for disbelieving the assertions of plaintiff's witnesses. Had the requested instruction been given this course of reasoning might well have been regarded by the jurors as not open to them.

Plaintiff moved for a new trial on the further ground of newly discovered evidence consisting of certain "entries in an official record book of the Laie, Oahu, Mission of the Church of Jesus Christ of the Latter Day Saints, said entries on their face showing that Paulo was the son of Kenoi and tending strongly to show that Paulo was the husband of Ia." In sup-

port of the motion an affidavit was filed showing that the record referred to was a "Book of Members" of the church named, in the official custody of Adelbert Bigler, an elder of the church and clerk of the Mission at Laie; that the "Book of Members" contains an accurate and complete record "of the name, date of birth, place of birth, and date of baptism of each member of said church aforesaid from its institution in said Territory, together with a record of the name of the father and mother, the place of baptism, the name of the person baptizing, the name of the office held in said church and the date when such office was taken together with the name of the person confirming the member to such office, for each and every member of said church since its institution in said Territory"; that the entries are as follows:

"Sex    Name    Date of Birth    Place of Birth    Name of father
Male: Paulo:        1835:        Hanalei, Kauai:    Waiohakini
"Name of mother    Date of baptism    Place of baptism    By whom
                                                          baptized
        Kenoi:            1862:        Pokii, Kauai:    Hoepu:
"Church office    When chosen to office    By whom ordained
        Elder:            1862:                Palau:";

that "accompanying said entries and immediately following the same is the record of entries concerning one 'Ia' a female, the record giving the date of her birth as 1838 and the date of her baptism as 1862, the same year with Paulo above named; that from the position of said entries as to the said Ia, your affiant believes without doubt that said Ia was the wife of said Paulo.

The evidence of the elder as to his belief concerning the inference to be deduced from the fact that the entries relating to "Ia" immediately follow those relating to "Paulo" would be inadmissible. Any such inferences, if proper at all, are to be made by the jury and not by witnesses. There is no memorandum in the book showing whether Ia was the wife of Paulo and the movant did not offer to prove that in the book the name of an unmarried woman never appears immediately following that of a married man.

Uuku v. Kaio, 21 Haw. 710.

It may be assumed that the book and its entries were admissible as evidence, that the evidence thus sought to be introduced was not merely cumulative within the meaning of the rule relating to new trials and that it was of such importance and probative force as to justify the granting of the motion under consideration. For another reason, however, a new trial should not be ordered.

It is well settled that in order. to prevail a party seeking a new trial on the ground of newly discovered evidence must show that due diligence was used to discover it. *Malani* v. *Puhi,* 5 Haw. 504. "It should appear not only that the proposed testimony is newly discovered, that it would be material to the issue and that it would not be merely cumulative, but that the" movant "did not lose the opportunity to lay it before the jury by his own laches. For when it appears to the court that the party might, by the exercise of due diligence, have discovered and obtained the proposed new testimony at or before the time of the trial, a new trial will not be granted",—with certain exceptions inapplicable in the case at bar. *Weston* v. *Montgomery,* 2 Haw. 309, 310. "There are but few cases tried in which new evidence cannot be hunted after trial, and in order to secure to parties the termination of their legal controversies the court must be wary about granting new trials upon insufficient excuses for not procuring the evidence when the parties had their day in court." *Burns* v. *Bowler,* 4 Haw. 303, 304. See also *Territory* v. *Kum Foo Sung,* 20 Haw. 195, 197. With equal clearness it has been held that the movant "must search for it" (the evidence) "wherever there is a probability of finding it". *Clement* v. *Cartwright,* 7 Haw. 676, 678; *Kaheana* v. *Nalimu,* 8 Haw. 271, 272.

This action was instituted in January, 1908, the law firm of Thompson & Clemons being then attorneys for the plaintiff, and was at issue in July of the same year. A trial was had in the early part of 1911 resulting in a directed verdict in favor of the defendants. Upon exceptions the verdict was set aside for error

of law committed by the presiding judge. At the second trial the jury failed to agree. A third trial, that now under review, was had in March of the present year. Isaac Kahilina died in 1902 and judicial proceedings relating to his estate were had in the probate court on Kauai in the course of which inquiry was made and evidence taken as to who inherited the personalty. Hana Scott and Puali Keawe testified at that hearing on the subject of the family pedigree. Mr. Lymer, of the firm of Thompson, Wilder, Watson & Lymer, appeared for the plaintiff at the last trial and had charge of the preparation of the case for that trial. Mr. Russell, of the same firm, was associated with Mr. Lymer at the last trial. In an affidavit filed in support of the motion for a new trial Mr. Lymer says: "that affiant, since his first connection with said case, has used the utmost diligence in tracing out and discovering all existing evidence material to the issues in said cause; that affiant has closely questioned every available witness and many old residents and has employed competent Hawaiians to make similar inquiries concerning all possible sources of evidence bearing upon said case; that all the living members of the family of the said Paulo have been many times questioned by affiant concerning the early life of the said Paulo, as to what fraternal or religious bodies he may have belonged to, as to any living persons who might know of such matters and affiant has used every means in his power to discover all material evidential facts bearing on said case but that at no time was it ever intimated to affiant by any one of the scores of people he has interviewed that Paulo was at any time a member of said Church of Jesus Christ of the Latter Day Saints; that affiant is not familiar with the customs of said church and did not know that any central office or Mission of the same where records of members thereof for the entire Territory were kept; that so far as the results of all of affiant's exhaustive efforts to discover evidence were concerned it did not appear that the said Paulo ever belonged to any organization either fraternal or religious within this Territory". Just when

Mr. Lymer's active connection with the case commenced is not shown. For aught that appears to the contrary it may be that some other member of the firm had charge of the preparation and presentation of plaintiff's case for the purposes of one or both of the earlier trials and there is no attempt at showing what efforts such other attorney, if any, made to procure evidence of the nature of that now sought to be introduced. If another attorney represented plaintiff at the earlier trials due diligence on his part also would be requisite in order to secure a new trial on the ground of newly discovered evidence. As far as the showing made is concerned, it may even be true that the earlier attorney was aware of the existence of this Mormon record but failed to introduce it for reasons which to him were satisfactory and that Mr. Russell also was aware of its existence. The decision, however, need not be based on this ground alone. Although it appears that Mr. Lymer examined "scores of people" as to what fraternal or religious organizations Paulo may have been a member of, it does not appear that search for the evidence was made by him or his client or on their behalf in the places where there was the greatest probability of finding it. It is a matter of common knowledge that the facts of baptism and membership in a religious body are often recorded, with accompanying explanatory notes relating to parentage and date of birth, on books maintained for the purpose by the religious body. It is common practice for those preparing the proofs on issues of Hawaiian pedigree to inquire at the churches, or other headquarters of the religious organizations, for such records and to examine them when found for the desired information. It is in the churches themselves that there is the greatest probability of obtaining authoritative information as to the existence and contents of such records. That the "Church of Jesus Christ of Latter Day Saints," generally known as "the Mormon Church", has an office and church in Honolulu, as well as a large colony and a church at Laie on this Island, is well known in the Territory. The plaintiff having failed to search for the

evidence "wherever there was a probability of finding it" (*Clement* v. *Cartwright, supra*), a new trial cannot be granted. The facts that at the time of the last trial the action had been pending for more than five years and that two trials had already taken place at each of which the plaintiff failed to obtain a verdict should have rendered all the clearer to plaintiff the necessity of diligence in the search for further evidence to strengthen plaintiff's case and emphasizes now after the third trial the propriety of the rule that in the absence of such diligence further litigation should not be permitted. "Courts are reluctant to grant a new trial for the discovery of new testimony after one trial,—much more after two. They require vigilance on the part of those in litigation in discovering and procuring material and important testimony. * * * Courts should be strict in their requirements when new trials are sought for such cause." *Trask* v. *Unity*, 74 Me. 208, 209, 211. "In deciding motions for new trials on account of newly discovered evidence courts have found it necessary to apply somewhat stringent rules to prevent the almost endless mischief which a different course would produce." *State* v. *Carr*, 21 N. H. 166, 173. "The rule" requiring diligence "is especially applicable * * * where there have been several trials." 29 Cyc. 891, 892. See also *Hoban* v. *Sandford*, 64 N. J. L. 426, 437 and *Hagen* v. *R. R.*, 91 N. Y. S. 914, 916.

The judgment is affirmed.

*W. B. Lymer* and *B. S. Ulrich* (*Thompson, Wilder, Watson & Lymer* on the brief) for plaintiff.

*A. Lindsay, Jr.,* for defendants.

## CONCURRING OPINION OF ROBERTSON, C.J.

I concur in the conclusion reached by the majority, also in the reasoning except as to the last point—the motion for a new trial on the ground of newly discovered evidence. It seems to me that except in one respect which will be explained the showing made as to diligence on the part of Mr. Lymer and the plaintiff

Uuku v. Kaio, 21 Haw. 710.

in searching for evidence was ample and constituted a stronger showing than was made in many cases that might be cited in which a new trial was granted. The statement made in the case of *Clement* v. *Cartwright,* 7 Haw. 676, 678, that a party must search for evidence "wherever there is a probability of finding it" would at first sight appear to require more than reasonable diligence but the opinion shows that it was intended as nothing more than an elaboration of the statement that a party must show that he used "due diligence." Such is the familiar rule. *Territory* v. *Kum Foo Sung,* 20 Haw. 195. More than reasonable diligence is not required, and in determining whether a sufficient showing has been made the court should take a reasonable and practical view of the situation. The fact that the evidence was in existence and that a more thorough search would have unearthed it does not prove that reasonable diligence was not used in the endeavor to find it. See *Hays* v. *Westbrook,* 22 S. E. (Ga.) 893; *Hilburn* v. *Harris,* 21 S. W. (Tex.) 572; *Sympson* v. *Bell,* 112 S. W. (Ky.) 1133; *Usher* v. *Ry Co.* 132 Fed. 405. Reasonable diligence does not necessarily involve an effort by the party to discover a book, writing or other evidence which he had no reason to believe existed, nor notice of any circumstances to put him upon inquiry concerning it. *Skinner* v. *Walker,* 98 Ky. 729, 736; *Watts* v. *Howard,* 7 Met. 478, 480; *St. Louis etc. R. Co.* v. *Hurley,* 30 Okl. 333, 339. In the case at bar exhaustive inquiry by Mr. Lymer failed to elicit any information which would lead him to suppose that Paulo had been baptized in the Mormon faith. Nothing whatever presented itself to prompt him to search the ancient archives of any particular church for a record of Paulo's baptism and reasonable diligence did not require that he should have searched the records of the various churches throughout the Territory. As there did not appear to be a "probability" of finding in the records of the Church of Jesus Christ of Latter Day Saints a record of Paulo's pedigree the failure to inquire for and search

those records did not constitute a lack of diligence on the part of the plaintiff or his counsel.

But in another respect the plaintiff's showing was deficient. Mr. Lymer is a member of the firm of attorneys which, with some changes in personnel, has represented the plaintiff since the action was instituted over five years ago. He does not say in his affidavit that he has had charge of the case since its inception or exclusively at any time. I understand it to be admitted that Mr. Lymer did not handle the case at the first trial. Who had charge of it at the second trial does not appear. The record shows that at the last trial J. W. Russell was associated with Lymer. From the fact that the evidence offered was not known of by Mr. Lymer until after the trial it does not necessarily follow that it was not known to counsel who acted for the plaintiff before Mr. Lymer took charge of the case nor does it follow that the existence of the evidence was not known to his associate Mr. Russell. The affidavits in support of the motion did not negative these possibilities. The plaintiff himself is chargeable with all the information which any and all of his attorneys had concerning the case, and if one of his attorneys other than Mr. Lymer had been aware that the evidence was available but thought it was not needed, or for any reason decided not to produce it, another trial of the case is not to be had simply because present counsel was not aware that the evidence existed and failed to find it after diligent search. In justice to the opposing party courts must demand a strict compliance with the rule which requires the moving party to show that neither he nor any attorney of his who has had any connection with the case knew of the existence of the evidence alleged to be newly discovered. Upon this ground I concur in the overruling of the exception to the denial of the motion for a new trial for newly discovered evidence.