# TERRITORY *v.* JOSEPH YOUNG, ALSO KNOWN AS JOE BLACK.

## No. 2069.

ARGUED JANUARY 27, 1933.          DECIDED FEBRUARY 18, 1933.

PERRY, C. J., BANKS AND PARSONS, JJ.

629

OPINION OF THE COURT BY PERRY, C. J.

The appellant was charged by indictment with having committed the crime of rape on one Bernice Lum, on March 12, 1932. After trial before a jury, he was found guilty and was sentenced to a maximum of thirty-five years' imprisonment at hard labor. The case comes to this court for review by writ of error containing thirty-seven assignments of error.

Assignments numbered 4 and 5 have been expressly abandoned. (See brief, pp. 24, 25.) Assignment number 2 is that the court erred in denying a motion for a new trial "on the ground that said verdict was contrary to the evidence adduced at the trial; in that it will appear from a perusal of all the evidence that a manifest injustice has been done the defendant which has injuriously affected the substantial rights of the defendant." Assign-

ment number 29 is that the court erred in refusing to direct a verdict for the defendant, "in that the weight of the evidence was insufficient to find the defendant guilty beyond a reasonable doubt; in that the Territory failed in its burden of proving the accused guilty beyond all reasonable doubt; in that said refusal to instruct * * * was prejudicial and deprived and . denied the defendant of his substantial rights." These assignments require a brief statement of the evidence. The theory of the prosecution was that the assault was committed on March 12, a few minutes before midnight. Two doctors testified that they made a physical examination of the prosecutrix shortly thereafter and within the same night and gave testimony tending to show that there had been hemorrhages in her eyes and abrasions and contusions about her face and neck, indicating in their opinion, that she had been choked or strangled. One of the doctors also gave testimony to the effect that he had made an examina-. tion of the perineal region and described the conditions that he found, which, taken together with the evidences of force found in her head and neck, tended to show the commission of the crime of rape. The testimony of these two physicians, taken by itself, would have been amply sufficient to support a finding by the jury, if the evidence was believed to be true, that the crime had been committed. In opening, however, the cross-examination of the prosecutrix, defendant's attorney said to her, in open court and before the jury, "We want the world to know, and especially you, * * * that on this night of March 12th you were ravished, raped, assaulted, deflowered and otherwise illtreated;" and again during the examination of Dr. R. B. Faus, a witness for the prosecution, defendant by his counsel expressly admitted "that the prosecuting witness was assaulted that night, forcibly," and the presiding judge thereupon said, "I would on that particular

point say that the doctor could be informed that he is not here to particularly bear down upon that; the defendant admits it; there is no issue before this jury but what this prosecuting witness was raped on that occasion." Unlike many, and perhaps most, trials under indictments charging rape, the issue was thereafter clearly and expressly limited, by the act of the defendant himself, to the question of whether it was the defendant who committed the crime.

There was evidence from many witnesses, and the testimony was undisputed, that on the evening of March 12, 1932, beginning at, or shortly after, nine o'clock, there was a dance at the home of one Esther Sur, on Beretania Street between Piikoi and Keeaumoku Streets in this city; that the dance was attended by about twenty young people and that the prosecutrix, the defendant and one Gilbert Halm attended and took part in the dance. There was testimony, also, that the defendant had one dance, at least, with the prosecutrix and that Halm also danced with her. In other words, there was evidence clearly tending to support the finding that prior to the time of the assault the prosecutrix was acquainted with the defendant. Prosecutrix testified that towards the end of the dance and shortly before midnight, she walked out with Halm, describing the course that they took in their walk, and that while the two were together at a spot indicated by her in her testimony, they saw the defendant peeping at them through a hedge; that she became alarmed and with Halm moved to another spot in the near vicinity; that a few moments later the defendant approached them and told Halm to "scram" or to "beat it;" that at that moment Halm was holding her by the hand and the defendant seized the prosecutrix and by force pulled her away from Halm's hold; that the defendant choked and strangled her, beat her and forced her

down to the ground and that she thereupon temporarily lost consciousness; and upon reviving somewhat she found that the defendant was in the commission of the act. Her identification of the defendant as her assailant was positive and direct. Halm gave testimony corroborating that of the prosecutrix in respect to the identity of the assailant. It was his testimony, also, that he was with the prosecutrix and saw the defendant peeping through the hedge and later saw him approach the two with the command to him, Halm, to depart; that he was afraid of the defendant and retired from the scene; that shortly thereafter he heard a scream and returned to the *locus in quo* and there saw a struggle going on, saw the defendant force the prosecutrix down to the ground, saw them both on the ground and saw that the defendant was on top of the prosecutrix.

In addition to this direct testimony there was other evidence, circumstantial perhaps, tending to support the view that it was the defendant who committed the offense. A pair of trousers with a spot or smear on one knee was introduced in evidence, testified to as having been worn by the defendant on the occasion in question and admitted at the trial by the defendant to have been so worn. The prosecution claimed that the smear was of soil from the premises where the assault occurred. The defendant, in a statement to the police before the trial, and again in his testimony at the trial, claimed that the smear came from a part of the athletic field at Kamehameha School in this city where, on the afternoon of the same day, March 12, he had lain on the ground. Dr. Hance gave testimony tending to show that he was qualified to testify as an expert in chemistry and in the use of the spectrograph, that he had taken samples of soil from the place of the assault and from a part of Kamehameha School field indicated by the defendant to him as

the spot where he had lain on the ground; that microscopically and with the spectrograph he had made examinations of the three samples of soil, to-wit, that from the place of the assault, that from Kamehameha field and that from the trousers and that it was his conclusion that the soil from the trousers was identical in kind with that from the place of the assault and was radically different from that obtained from Kamehameha field.

There was also testimony of the finding, in a crushed condition, at the place of the assault, within a few minutes after the commission of the assault, of a package of Lucky Strike cigarettes and other testimony that the defendant was in the habit of smoking cigarettes of that kind and none other. There was also testimony that within a few minutes after the commission of the assault two handkerchiefs were found at the place of the assault, similar in kind to four others which were found at the home of the defendant within a few hours after the commission of the offense, and further testimony that prior to the day of the assault the wife of the defendant had bought for him six handkerchiefs of which the four were a part.

It is true that the defendant, on the witness stand, denied the accusation *in toto*. His defense was an alibi; and it is also true that there was other testimony which tended to support the theory of his defense. The issue was purely one of fact. The question was whether the jury should believe the testimony of the prosecutrix and of Halm or whether it should disbelieve that testimony and believe the evidence of the defendant and of his witnesses that he did not commit the offense and that at the time of its commission he was elsewhere than at the place of its commission. The jury, by its verdict, showed that it believed the testimony and other evidence of the prosecution and that it did not believe in the truth of

the defense of alibi.

It may be that in the earlier Hawaiian cases expressions are to be found indicating that the court was of the opinion that a verdict could. be set aside if it appeared to the court to be against the weight or the great weight of the testimony. If that was once the view of this court, it has been long since departed from. For many years past it has been clearly established as the law of this jurisdiction that, whether in a criminal case or in a civil suit, a verdict cannot be set aside by this court merely on the ground that it is against the weight of the evidence and it must be upheld and a new trial refused if there is any substantial evidence, more than a mere scintilla, tending to support the findings necessary to the verdict rendered. Citations of Hawaiian cases on this point ought to be no longer necessary. The statute relating to writs of error (§ 2536 R. L. 1925, as amended by Act 42, L. 1931) expressly declares that there shall not be a reversal "for any finding depending on the credibility of witnesses or the weight of the evidence." Assignments numbered 2 and 29 cannot, therefore, be sustained.

Assignment number 1 is that the court erred in denying the motion for a new trial "in that it is manifest from a perusal of all the evidence that the jury misunderstood the law and the instructions of the court and that mistake, misconduct or prejudice on the part of the jury was the cause of rendering said verdict." Assignment number 6 is that the court erred in refusing to grant a new trial "for the reason of the misconduct of the jury in rendering a verdict while a prejudice and bias of the prevalent 'rape-hysteria' existed in their minds, which prejudice and bias was adverse to the defendant." Assignment number 9 is that the court erred in refusing to grant a new trial "on the ground of the general, widespread newspaper prejudice concerning the public rape-

hysteria that existed and was prevalent in Honolulu, T. H., at the time of said trial, which was short of lynch law; and which followed, and was concomitant to the notorious, world-wide so-called 'Massie-Fortescue trial,' wherein the territorial newspapers commented on the pretrial guilt of Joseph Young; wherein the misconduct of * * * the members of the Citizens League for Good Government was unfair, unconstitutional, prejudicial and criminal in publicly prosecuting and persecuting this indigent and helpless defendant; wherein the pretrial newspaper statement of chief of police, Mr. Weeber, was published, commenting that he was convinced of the guilt of the defendant and that what we need here is a 'legal necktie party;' wherein the pretrial newspaper statement of prosecutor John C. Kelley was made, proclaiming that he was satisfied that Joseph Young was guilty of having raped Bernice Lum and that this time he would not accept a plea of guilty, but instead, he would insist on the maximum penalty, inferring and meaning thereby that he would demand the hanging of the defendant, Joseph Young; wherein the misconduct of the grand jury that found a true bill against this defendant in promulgating the expulsion and ostracism of Gilbert Halm from the McKinley High School; wherein the misconduct of the authorities and officials of the McKinley High School in actually expelling and ostracizing said Gilbert Halm; wherein deputy prosecutor, Mr. Charles E. Cassidy, delivered a lecture on said subject to the McKinley High School students, as a result of, and the direct consequence of, the aforesaid; wherefore a conclusive presumption inevitably and inescapably arises, that the jury were prejudiced against the defendant and that a manifest injustice has been committed which has injuriously affected the substantial rights of the defendant." There was no proof, by affidavit or otherwise, of any of the facts re-

ferred to in these assignments or of the condition claimed to have resulted therefrom that prospective jurors in the first circuit in which the defendant was awaiting trial were so prejudiced thereby that the defendant could not have a fair and impartial trial. Judicial notice could not properly be taken by the court of most of these alleged facts, and perhaps not of any of them. However that may be, the conditions, such as they were, existing in the community at that time were well known to the defendant and his attorneys prior to the commencement of the trial. On March 21, six weeks before the commencement of the trial, counsel for the defendant made a motion for an order "to restrain the Honolulu Citizens Organization for Good Government from meeting and openly discussing the evidence in the above entitled matter." The record of the discussion which was had at the hearing of the motion shows clearly that the conditions referred to were then well known to counsel for the defendant. On May 2, and again on the day following, prospective jurors were examined under oath by counsel for the defendant as well as by counsel representing the Territory, and at the end of the session of the second day, as appears from the minutes, "counsel for the defendant waived their twelfth peremptory challenge." The defendant in the case at bar was entitled under the statute to twelve peremptory challenges and exercised only eleven of these, waiving the last one. This in itself was the equivalent of a statement, on behalf of the defendant, that at that time he was perfectly satisfied to go to trial before the twelve proposed jurors who were then in the jury box. The jury was thereupon sworn and the trial proceeded. At no time, either before or during the trial, was there a motion for change of venue on account of supposed prejudice on the part of the jurors or for any other reason. If, immediately prior to the trial, conditions existed in

this community which, in the judgment of the defendant or his attorneys, gave cause for the belief that an impartial trial could not be had in the first circuit, the remedy lay in a motion for a change of venue. Trial courts are always ready to grant such motions upon sufficient cause being shown. A defendant, with complete knowledge of the facts and conditions existing and after a thorough examination of those who are called as jurors, cannot be permitted to accept the jury and go to trial and then, after an adverse verdict has been rendered, to ask for a new trial on the ground of prejudice of the jury caused by those preexisting conditions.

Assignment 3 is that the court erred in refusing to grant a new trial on the ground of newly discovered evidence in that "said newly discovered evidence was material, relevant and competent to the issues of said cause; in that it was absolutely necessary and essential to explain away the ambiguity, confusion and uncertainty that existed, and still exists, upon the time-element of the assault; that said time-element was and is an absolute prerequisite and crucial to the defense alibi; that said newly discovered evidence has come to light, and to the knowledge of the defendant and his counsel, as a surprise, and after the trial and conviction of said cause, and upon which this defendant has never been heard; that said newly discovered evidence was particularly and peculiarly within the exclusive control, knowledge and jurisdiction of the Territory of Hawaii; that it was not only unknown to the defendant and his counsel, but it was in fact, impossible for them to obtain or acquire it, after repeated attempts were made by them to secure it; that said newly discovered evidence proves that the original call of Lum King (territorial witness) was telephoned in to the main police station, and that the said main police station, in its turn transmitted and relayed said call to officer

Rickard of the radio department of the police; that the 12:05 A. M.—12:06 A. M. time of officer Rickard is not the original time that Lum King telephoned in to the main police station; that the unknown original time is the best and only evidence competent to go to the jury; that the defendant, in being denied and deprived of said newly discovered evidence is denied and deprived of his constitutional rights—that he be found guilty by all the material evidence beyond all reasonable doubt; that since the defendant and his counsel have been deprived as aforesaid, to obtain and secure said evidence of the time of the original call, the presumption arises that the Territory has concealed and omitted to present that material and crucial operative factor; that if the time of the said call of Lum King was 11:50 P. M. to 11:55 P. M., said evidence as aforesaid, will conclusively prove the innocence of this defendant; that said newly discovered evidence further proves the perjury of officer Seymour, the only rebuttal witness of the Territory, on the aforesaid crucial time-element of the defense alibi; that said newly discovered evidence further confirms that the Territory has failed in its burden of proving the defendant guilty beyond all reasonable doubt."

In the motion for a new trial presented to the presiding judge the only reference to this subject is as follows: "Newly discovered evidence will be offered at the new trial by Cecil Rickard, police officer, that received and transmitted the message to send a radio car to South Beretania Street, between Piikoi and Keeaumoku Streets, in connection with an assault case. That the time-element in said assault being crucial; that this new evidence will explain away the material and crucial time-element so important to this case. Affidavit of Cecil Rickard is annexed hereto." There were three affidavits in support of the motion, one by Rickard and one by each of the

two attorneys who appeared for the defendant. Rickard's affidavit is to the effect that on March 12 and 13 he was a police officer and was on duty from 8 P. M. on March 12 to 4 A. M. on March 13, at the radio office at the Honolulu police station; that his chief duties were to receive calls and messages and to transmit or broadcast them to radio cars; that he received a message from the officer in charge at the receiving desk of the police station to send a radio car to South Beretania, between Piikoi and Keeaumoku, in connection with an assault case, at or immediately prior to 12:05 o'clock A. M., on March 13; that when he had everything in readiness to broadcast the message and was just about to do so, officer Rodenhurst, of radio car number six, telephoned to report that he and another officer were at the Empire Grill to have their meal; that the affiant thereupon informed Rodenhurst to immediately proceed to the *locus in quo;* that the time when he transmitted the message to Rodenhurst was 12:06 A. M., of March 13; and that officer William Seymour of the police department was not present at the time the message was received or transmitted by the affiant.

Judging from the statements made by counsel for the appellant at the hearing in this court, in answer to questions by the court, as to what evidence was adduced on the points referred to in Rickard's affidavit, the probability is, without a close examination of the transcript in this regard, that the evidence of Rickard, in so far as it tends to show the precise hour and minute when the call was received by him and when it was transmitted to Rodenhurst, is merely cumulative and for that reason alone it cannot now be properly regarded as newly discovered evidence. However that may be, for another reason this assignment cannot be sustained. There was absolutely no evidence tending to show the degree of diligence used by

the defendant or by his attorneys in searching for the evidence of Rickard, or that they or any of them used any diligence whatsoever in the matter. Both of the attorneys for the defense signed affidavits in support of the motion for a new trial; but each of them was, in the affidavits, entirely silent as to what efforts, if any, he made to secure the evidence which it is now desired to present. It is true that in the third assignment of error the statement is made that the evidence "was not only unknown to the defendant and his counsel, but it was in fact impossible for them to obtain or acquire it after repeated attempts were made by them to secure it." This unsworn statement, made in an assignment of errors, long after the presentation and disposition of the motion for a new trial, is not evidence and cannot take the place of evidence in support of a motion for a new trial and cannot be used to show that the trial judge erred in denying the motion. It is out of place in the assignment of errors. The evidence in the case cannot be enlarged in this manner.

There can be no doubt at this day, in this jurisdiction, that before a motion for a new trial can be granted on the ground of newly discovered evidence, it must be proven clearly, *inter alia*, that due diligence was used by the defendant and by each of his attorneys to discover the evidence prior to the conclusion of the trial and that the search was made for it in the place or places where it would most likely be found. It must appear "that the defendant did not lose the opportunity to lay it before the jury by his own laches." *Weston* v. *Montgomery*, 2 Haw. 309, 310. In *Burns* v. *Bowler*, 4 Haw. 303, 304, the appellate court said of the evidence which was claimed to be newly discovered: "Nor does it seem to us to be evidence which the exercise of reasonable diligence on the part of the defendant could not have procured at the trial. * * * There are but few cases tried in which new

evidence cannot be hunted after trial, and in order to secure to parties the termination of their legal controversies the court must be wary about granting new trials upon insufficient excuses for not procuring the evidence when the parties had their day in court."

"There can be no doubt that the affidavits in support of a motion for a new trial, on the ground of newly discovered evidence, should show that the evidence is newly discovered, and that due diligence was used to discover it." *Malani* v. *Puhi,* 5 Haw. 504, 505. "The plaintiff's showing of diligence is not satisfactory; his allegation is, that he 'used every endeavor to procure all the evidence that he knew of;' that is not sufficient; a party must use due diligence to procure all the important evidence that exists, he must search for it wherever there is a probability of finding it." *Clement* v. *Cartwright,* 7 Haw. 676, 678. In *Kaheana* v. *Nalimu,* 8 Haw. 271, 272, the court remarked that defendant's counsel could not claim to be taken by surprise by the evidence in the case when "under the circumstances it does not appear that the defendant has exercised a reasonable diligence in preparing her case." In *Republic* v. *Carvalho,* 10 Haw. 446, 449, the court reviewed and reaffirmed the rulings above quoted on this subject.

"An affidavit should show positively, not only that the evidence was not known before the verdict, but that the applicant or his attorney used due diligence to discover and produce the new evidence at the trial. Evidence discovered soon after the trial by systematic inquiry or search, as in the case at bar, usually indicates that due diligence was not exercised to discover it before the trial." *Territory* v. *Kum Foo Sung,* 20 Haw. 195, 197. In *Uuku* v. *Kaio,* 21 Haw. 710, 721, 724, the court said that when more than one attorney represents a party it must be made to appear that both attorneys, as well as the party

himself, exercised due diligence in seeking for the evidence which is relied upon as newly discovered. It said: "It is well settled that in order to prevail a party seeking a new trial on the ground of newly discovered evidence must show that due diligence was used to discover it." It again referred to the earlier Hawaiian cases on the subject, approving of all that had been there said. It added: " 'Courts are reluctant to grant a new trial for the discovery of new testimony after one trial,—much more after two. They require vigilance on the part of those in litigation in discovering and procuring material and important testimony. * * * Courts should be strict in their requirements when new trials are sought for such cause.' * * * 'In deciding motions for new trials on account of newly discovered evidence courts have found it necessary to apply somewhat stringent rules to prevent the almost endless mischief which a different course would produce.' "

In the case at bar not only is there an utter absence of any showing that due diligence was used, but on the contrary it expressly appears from the transcript of the testimony that in cross-examination William Seymour testified that the name of the man in the radio office of the police station who received the telephone call relating to the assault was "Cecil Rickard," that Rickard was at the time of the offense a police officer and that it was Rickard who, upon receipt of the telephone call, "immediately broadcasted on the radio and entered it on the station log, noting the time when he broadcast the message." In his affidavit in support of the motion for a new trial Rickard says that he is a resident of Honolulu and that "since January 1, 1932, and up to and including the date hereof he has not been out of the city of Honolulu, Territory of Hawaii, and that he has had his residence during said period" at a place which he names. In other words, it appears beyond doubt that before the conclusion

of the trial the defendant and his attorneys knew of Rickard's existence and identity and of his connection with the receiving and broadcasting of the telephone and radio messages in question and that he entered in the log of his office the time of the receipt and the sending of these messages. It clearly appears that the defendant and his attorneys had knowledge during the trial of where to search for Rickard and for such testimony as he might be able to give. No request was made for a continuance in order to make a search for the evidence. Under these circumstances the evidence of Rickard cannot possibly be regarded as newly discovered. There was an utter lack of diligence in searching for it.

Assignments 7 and 8. These relate to the refusal of the presiding judge to grant a new trial on the ground of the alleged misconduct of the prosecutor, John C. Kelley, and of inspector Michael Morse of the detective department in committing "an assault and battery on the body of the defendant, Joseph Young, with a threat to kill him," the assault occurring within the judiciary building "immediately after the adjournment of the trial day of May 4, 1932, at 4:00 P. M. and within the hearing and sight of the aforesaid jury,"—the further statement in each of these two assignments being "that because of the probability that said jury might have heard, seen or learned of the aforesaid misconduct, in that they were not segregated, a presumption arises that they were prejudiced against the defendant." The eighth ground of the motion for a new trial reads as follows: "Misconduct of jury. Probability of the jury hearing, seeing or learning of the assault of Mr. Kelley and inspector Morse upon the defendant, Joseph Young, and rendering a verdict without informing the court of their bias and prejudice." Aside from this paragraph in the motion for a new trial there is nothing in the record showing the facts upon

which these assignments of error are based. No affidavit was filed in support of this ground of the motion for a new trial. It does not appear that any request was made of the presiding judge to instruct the jury that the incidents complained of were utterly immaterial to the question of the guilt or the innocence of the defendant, or that any motion was presented for the discharge of the jury. In so far as anything appears in the record to the contrary the incidents did not, at the time of their occurrence, appear to the defendant to be sufficiently serious or relevant to require any instruction to the jury or a discharge of the jury. The trial was allowed to proceed without any remedy being sought. A defendant on trial under an accusation of crime, with knowledge of an occurrence such as that here complained of, cannot be permitted to stand by and allow the trial to proceed, without seeking any remedy or ruling at the hands of the presiding judge, and then come to this court and ask that the verdict be set aside on the ground of prejudice or misconduct on the part of the jury. "We do not at all sustain the proposition that counsel may stand by and without objection allow the court to commit errors of law and then, if in time and the sentence or judgment be not executed, ask the appellate court to correct the alleged errors." *Woodward* v. *Republic,* 10 Haw. 416, 417. "The plaintiff did not join with the defendants * * * in moving for the discharge of the jury and the entry of a mistrial but saw fit to stand by without objection, speculate on the verdict, accept it if favorable and attack it if unfavorable. Such conduct cannot be encouraged. Under such circumstances the plaintiff must be regarded as having waived the misconduct on the part of a stranger whereby it was sought to influence a juror." *Dwight* v. *Ichiyama,* 24 Haw. 193, 195, 196. Under the circumstances of the case at bar the appellant must be deemed to have

waived the misconduct, if any, of the officers and the possibility of prejudice on the part of the jury. In the defendant's opening brief (pp. 31, 32) the following statement is made in connection with the occurrences complained of: "On the morning of May 5, 1932" (the day following the alleged assaults), "in chambers, with Judge A. M. Cristy (trial court presiding), a brief statement of said assault was mentioned, without giving the details. Counsel for the defendant requested that the court caution the jury on said assault and left it entirely to the court's discretion. The court candidly and honestly believed that said caution was not necessary, in fact said that the requested caution might prejudice the defendant. Thereupon the matter was closed." To say nothing of the fact that this statement is wholly unsupported by anything in the record of the proceedings in the lower court, it clearly shows, upon the defendant's own present statement, a waiver of the alleged irregularity. It is the equivalent of a statement that the presiding judge believed that nothing prejudicial to the defendant had occurred and that the defendant's attorney acquiesced in that view and therefore took no further steps in the matter.

Assignment 10. This assignment is that there was error in the refusal to grant a new trial "on the ground of the misconduct of the jury in rendering a verdict of guilty 'without capital punishment.' " The argument is advanced that "said misconduct of the jury implied that either a reasonable doubt concerning the guilt of the defendant existed in their minds, or that said verdict was a compromise verdict influenced by prejudice, coercion and intimidation." There is an utter absence of evidence indicating that the verdict was "influenced by prejudice, coercion or intimidation." From the mere fact that a jury recommends leniency the inference cannot properly be drawn that the verdict was arrived at in consequence

of prejudice, coercion or intimidation. If, as is stated by the defendant in this assignment, "the evidence adduced disclosed no mitigating or extenuating circumstances," the defendant was not prejudiced by the recommendation. New trials cannot be granted on the mere ground that a jury erroneously recommended leniency.

Assignments 11, 23 and 26. These charge that there was error in the admission in evidence of the Territory's Exhibit "J" consisting of four handkerchiefs and in the admission of the testimony of John Jardine concerning the handkerchiefs, "in that said evidence and Exhibit 'J' are incompetent, irrelevant and immaterial because conjectural, vague and not properly connected with the issues of the case, and only tended to confuse and prejudice the jury. Said evidence and Exhibit 'J' violated substantial rights of the defendant." They further charge error in the denial of the defendant's motion to strike from the record the four handkerchiefs "obtained illegally from the home of the defendant, without his consent, while he was incarcerated; because said exhibits were irrelevant, immaterial and incompetent; in that said exhibits were conjectural, speculative and confusing; in that the Territory failed in its burden of proof, in legally connecting said Exhibit 'J' with any evidence that tended to identify the defendant as the culprit of said assault." Rodenhurst, a police officer, gave testimony tending to show that within a very few minutes after the commission of the offense he found on the ground, at or near the place of the assault, two men's handkerchiefs; and these were introduced in evidence. Subsequently, Jardine, also an officer, testified that on the following day he went with the defendant's wife to the home of the defendant and there obtained four handkerchiefs which are the handkerchiefs now referred to as Exhibit "J." The defendant's wife testified that a short time prior to the day of the assault she had

bought for the defendant six handkerchiefs and that the four in question were of the six, that the six were all of a "colored kind" and referring to the two that were found at the place of the assault said: "I bought this kind of colored kind, but I don't remember exactly what kind of colored kind." Answering the question, "Did you buy handkerchiefs that looked something like that for your husband?" she replied, "Yes I had six that kind of handkerchiefs," referring to Exhibits 2 and 3, found at the place of the assault. Upon this state of the evidence, the four handkerchiefs were admissible. It was for the jury to construe the testimony given by the wife and to determine whether the two handkerchiefs found at the place of the assault were of the same lot of six to which the four found at the house belonged and, ultimately, to determine whether the two found at the place of the assault had been left there by the defendant. Relative questions of the strength or the weakness of this evidence were for the jury alone to determine. The same is true of an objection made on behalf of the defendant that "those are handkerchiefs that can be bought any where, every five and ten cents store." That was an argument addressed to the weight and not to the admissibility of the evidence. This subsidiary issue, of whether the two handkerchiefs belonged to the defendant and were left by him at the place in question, was material.

In assignment 23 the defendant makes the further claim that the four handkerchiefs were "obtained illegally from the home of the defendant, without his consent, while he was incarcerated," and the argument was advanced orally in this court that the seizure of the handkerchiefs was illegal because unauthorized by any search warrant. In addition to the testimony of Jardine that on the occasion when he obtained the handkerchiefs he was accompanied by the wife of the defendant, there was other

testimony to the effect that the four handkerchiefs were taken out of a bureau in the defendant's home by his wife and placed on a table, that the officer took the handkerchiefs from the table and that he said, "Anyhow I take them," and she said, "All right." It is unnecessary for us to decide whether the constitutional protection afforded by the fourth and fifth amendments was or could have been waived by the defendant's wife in his absence. So, also, it is unnecessary to say whether the objection relating to the alleged illegality of seizure should have been taken in some form before the trial. A careful examination of the record shows that it was not taken, either before the trial or during the trial. The only objection noted by defendant's counsel to the introduction of the evidence was that above considered of immateriality, irrelevancy, remoteness and vagueness. The same is true of the motion to strike made at the close of the case. Even the motion for a new trial makes no reference to any supposed illegality in the taking of the handkerchiefs. Assuming, for the purpose of this case, that the illegal seizure of handkerchiefs or other articles from a person's home, without a search warrant, renders the articles so seized inadmissible in the prosecution of a criminal charge against the owner of the articles, it is nevertheless true that the objection may be waived and is waived if it is not seasonably called to the attention of the trial court. Some courts have held that it is too late to present the question for the first time during the trial, on the theory that the court should not be asked to enter, at that time, upon a trial of the collateral issue as to whether the taking was illegal; but whether before the trial or during the trial, it certainly is true that the opportunity should be given to the trial court to examine into and decide the question of illegality in order that it may intelligently determine whether the evidence is admissible.

Assignment 12. This assignment is that the court erred in refusing to grant a new trial "on the erroneous admission of the evidence of the territorial witness, officer William Seymour; wherein he was permitted to refresh his recollection from a hearsay document and give testimony to secondary evidence without showing that the original, best evidence was unobtainable; further, that said evidence was incompetent, immaterial and irrelevant; in that it was hearsay evidence and violated the best evidence rule and was not proper rebuttal testimony. * * * The circuit court further erred in refusing to strike all of said evidence from the record upon the motion of the defendant." The only reference to this subject in the motion for a new trial is that contained in subdivision 11 and reads as follows: "Erroneous admission of evidence. * * * Evidence of officer Seymour wherein he was permitted to refresh his recollection from a hearsay document on the time-element, crucial to the case."

William Seymour, a witness called in rebuttal by the prosecution, testified that he was a motorcycle officer in charge of the police radio patrol and was on duty as such on the night of March 12 and 13 at midnight and thereafter. He then said: "Whenever a call is made—a call is received at the headquarters it is immediately broadcasted to the respective car in that district, and on this particular occasion a broadcast was sent immediately after a call at 12:06 on the 13th to radio patrol car No. 6, which was then at the Empire Cafe. * * * I was present when the call came in that resulted in the broadcast for the radio car. The broadcast was sent immediately after the phone was hung up. A record was kept of the radio call, but the radio call was sent out immediately after the call came in over the telephone. I have the record here that shows what time that call was sent out. Q What time was the call sent out? A 12:06—12:05 this call was

sent out * * *. At 12:06 No. 6 patrol reported from the Empire Grill confirming the call to Beretania Street. I mean 12:05 and 12:06 A. M. on March 13, 1932. * * * Q How do you know what time the announcer on watch received the call? A I was right there, and it went down on the typewriter right after the call was made. * * * Do you know whether Rickard" (who received the call) "looked at the clock to get the time? A He always does. Q Did you look at the clock at the time the call came? A I couldn't remember that far back. Q Then if that record is mistaken you are mistaken? A I don't think that record is mistaken. Q Well, assuming that it is, assuming that record is mistaken, then you would be mistaken? A I couldn't testify directly as to the time; a few minutes either way, it was shortly after the hour of midnight. Q Of your own knowledge? A Of my own knowledge. Q There was a clock there? A There was a clock there. * * * Mr. Esposito: I object to the record, your Honor. The Court: The record has not been offered. Mr. Esposito: I make a motion to strike this testimony out; plain hearsay, your Honor, violating the best evidence rule. This man of his own knowledge has testified he doesn't know what time it was. The Court: The motion to strike will be denied, the matter being left for the jury upon the actual method by which this witness gets his recollection." Then followed redirect and recross-examination, in the course of which the witness said: "It was shortly after midnight," that the call came in, "I could remember within two or three minutes of the time. I am absolutely sure it was after midnight * * *." The police record of the receipt of the telephone call and the broadcasting of the radio call was then offered in evidence and an objection to its introduction was sustained. The witness continued: "I was sure it was midnight—shortly after midnight. I can remember within a few minutes.

* * * It was between 12 and 12:10, to be absolutely sure, but exactly to the minute I could not say, but I am positive it was between 12 and 12:10, it was after 12:01,"— giving as his reason that it was after 12:01 that "they go to lunch, usually go to lunch at twelve, and the boys were all pretty busy and nobody went out for lunch. * * * I looked at the clock right shortly after 12 o'clock, between 12 and 12:10. I remember that I looked at a clock at 12 o'clock. I remember that absolutely."

There was no objection to the admission of any of this testimony. The only objections noted were in the form of two motions to strike, one that noted above and the other at the conclusion of the testimony of the witness when counsel said: "Now, your Honor, I make a further motion to strike the testimony as to the record off; that I am deprived of the right to cross-examine—The Court: The court has ruled the record itself out of the evidence but as a document has permitted comparison of the testimony of the witness. The record was a corroboration in the transaction, and he had it and refreshes his recollection."

When the witness was being questioned on the subject there was no objection to his referring to the police record, if he did so. Assuming that a motion to strike, without prior objection, is sufficient to present the question of the admissibility of the testimony when a witness has referred to a writing in order to refresh his recollection, there was no error in the denial of the motions because they related to the whole of Seymour's testimony and did not differentiate between that part of his testimony, if any, which was aided by reading from the record and that part which was expressly given as being based entirely upon his own knowledge and independent recollection. As appears above the witness testified expressly and of his own knowledge and independent recollection that the receipt of the

telephone call and the broadcasting of the radio call occurred between midnight and 12:10 A. M., or to be exact, between 12:01 A. M. and 12:10 A. M. This evidence was clearly admissible. The motion to strike was general, relating to all the evidence and therefore could not properly be granted. "A part, at least, of Moir's statement as to the conversation was clearly admissible, and as the objection was a general one, interposed to his testifying to it at all, and there was no motion to strike any part of it, we cannot say error was committed. 'As a rule objections to the evidence, to be available on appeal, must point out the particular part of the evidence which is objected to. If any of the evidence was admissible, a general objection is not sufficient.' 3 C. J. 818." *Ter.* v. *Palai,* 23 Haw. 133, 139.

Assignments 13, 14, 15, 16, 17, 18, 19, 20 and 28. In these it is asserted that the court erred in receiving the testimony of Dr. Hance and a pair of trousers worn by the defendant on the night of the assault. Dr. Hance admittedly qualified as an expert in chemistry. He also gave testimony tending to show that he was an expert in the use of a spectrograph. Referring, then, to a pair of trousers which had been shown to have been worn by the defendant on the night of the assault and to have had a spot or stain or smear on one of the knees, the witness testified that he had examined, both microscopically and spectrographically, some of the material taken from the stain or smear and had also examined in the same ways a composite sample of soil taken from six or eight spots at or near the place of the assault and another composite sample taken from a few spots at the place indicated by the defendant on a sketch as the place where he had lain on Kamehameha field on the afternoon preceding the evening of the assault. The witness gave as his opinion or conclusion that "the soil smear on the trousers is quite

similar, very similar, to the Makiki soil" (meaning the composite sample taken from the place of the assault) "and totally unlike the Kamehameha soil" (meaning the composite sample taken from Kamehameha athletic field). He also testified in effect that, making stains on clean fabric from the same trousers, with samples respectively from the place of the assault and from the Kamehameha field, he found that there was a similarity between the stain produced from the Makiki soil and the stain originally on the trousers and that the stain produced from the sample from Kamehameha field was "a reddish yellow smear totally different from the one originally on the trousers." Referring to the spectrographic analysis, he found that "the Makiki soil and the smear on the trousers gave an identical photograph, absolutely identical" and that "the Kamehameha soil was also totally different from the Makiki soil." He said that "according to" my "spectrographic examination the Makiki soil and the trousers sample corresponded exactly," and "the Makiki soil and the Kamehameha sample were entirely dissimilar" and that "the trousers sample and the Kamehameha soil were absolutely dissimilar."

The grounds urged in support of the objections to the admission of this witness's testimony and of the motion to strike out the testimony and the trousers were in brief that the testimony was "unnecessary, unprecedented, immaterial, irrelevant, incompetent, vague, indefinite and conjectural" and that the witness usurped the functions of the jury.

It may be that prior to the trial of this defendant opinion evidence, from one who has received special training in chemistry and in the use of the spectrograph, had not been received or offered in evidence. That, however, would not be, in itself, a sufficient reason for excluding the testimony. Each and every form of opinion

evidence now familiar to the courts has necessarily had its beginning, a first time when it was admitted. Science is progressive. In principle opinion evidence from a chemist and an expert on the spectrograph is not any different from opinion evidence from experts of other classes.

So, also, the fact that the expert, on his own statement, used only from three to five milligrams of soil (3/29000 to 5/29000 of one ounce) in suspension in water in his tests, does not render the testimony inadmissible. He testified that the quantity of soil that he used plus the water aggregated one cubic centimeter and that "is about one hundred times as much as you need for a microscopic slide." The truth and the accuracy of that statement, as well as the truth and the accuracy of each and all of his other statements were matters for the jury to consider and to determine. There was nothing vague or conjectural about his testimony. Correct or incorrect, his opinions were very definite and very clearly expressed. Their weight was for the jury.

Assignments 21 and 27. These relate to the refusal of the court to strike out from the evidence a pair of men's "shorts" which were testified to as having been worn by the defendant at the time of the assault. There was testimony from Dr. Faus that there were certain spots "near the middle and front" of the shorts. There had been other testimony by a doctor to the effect that upon an examination a few minutes after the commission of the assault, the perineal region of the prosecutrix was covered with blood. Dr. Liu testified that from his visual examination the spot on the shorts "was a coffee-brown colored stain" and that diluted blood will give a "coffee stain color" and that the stain in question "looked like it has been diluted." Dr. Faus testified, when asked to give "a general description of what was apparent to your"

(his) "eye at the time, without any further examination by instrument or otherwise," that "it resembled a bloody, serous material" and that by "serous material" he meant a "straw colored fluid in which blood cells float" and that it might have been "a discharge gotten from the human body, from an abrasion or cut." Proceeding, then, to describe a "guaiac test for hemoglobin" which he had made of the spot on the shorts, his testimony on that subject was received without objection. Subsequently defendant moved to strike "all the evidence on the blood test" and, the prosecution assenting, the motion was granted. The court instructed the jury to disregard all that it had been "listening to in connection with the test." There was no motion to strike any of the testimony of either Dr. Liu or Dr. Faus as to the resemblance between the stain on the shorts and a stain of diluted human blood. Under these circumstances the shorts were properly admitted in evidence and the motion to strike was correctly denied.

Assignment 22 is to the refusal of a motion to strike from the record Exhibit "E" consisting of three handkerchiefs. There was testimony by a police officer that within a very few minutes after the assault he found these handkerchiefs on the ground at or near the place of assault as indicated to him by the prosecutrix, who was still in the vicinity when he arrived. Two of them were men's handkerchiefs. Together with the evidence, already above referred to, of the finding of four handkerchiefs at the home of the defendant, these two were clearly admissible in evidence. So, also, was the third, a lady's handkerchief. The prosecutrix testified that it was hers.

Assignments 24 and 25. These relate to the denial of the motion to strike from the record Exhibit "H," a shirt. A police officer testified that defendant admitted to him that it was his shirt and that he had worn it at

the time of the assault. The shirt had certain marks on one of the sleeves. The evidence was admissible.

Assignment 30. The court refused to give defendant's requested instruction number 8, relating to presumptions of innocence and to reasonable doubt. The subject was amply covered by other instructions.

Assignment 31. The court refused to give defendant's requested instruction 10, reading as follows: "If after consideration of the evidence in this case any juror shall entertain a reasonable doubt as to the guilt of the defendant, it is the duty of such juror so entertaining such doubt not to vote for a verdict of guilty." This instruction, as drawn, was incomplete and therefore misleading. It was correctly refused.

Assignment 32. The court refused to give defendant's requested instruction number 12, reading as follows: "I instruct you that in regard to the charge of rape, it is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, though never so innocent, and you should be the more cautious upon trials of offenses of this nature, wherein the court and jury may with so much ease be imposed upon without care and vigilance; the heinousness of the offense many times transporting the judge and jury with so much indignation that they are over hastily carried to the conviction of the person accused thereof by the confident testimony sometimes of malicious and false witnesses." This instruction was clearly argumentative and a comment on the evidence. It was correctly refused.

Assignment 33. The court refused to give defendant's requested instruction number 13, reading as follows: "I instruct you, * * * that in this case prejudice is likely to result because of the heinous nature of the crime charged, but you must always remember that it is an accusation easily to be made and hard to be defended

and consider, scrutinize and weigh carefully all of the evidence in the case, uninfluenced by the character of the crime itself." The same comments apply as in number 32.

Assignment 34. The court gave the Territory's requested instruction number 5, reading as follows: "I further instruct you that a defense interposed by the defendant in this case is what is known in law as an alibi, that is, that the defendant claimed that he was at another place at the time of the commission of the alleged crime, and I instruct you that such defense is as proper and legitimate, if proved, as any other. Such defense must be such as to show that at the very time of the commission of the crime charged the defendant was at another place so far away and/or under such circumstances that he could not, with ordinary exertion, reach the place where the crime was committed so as to have participated in the commission thereof." The court also gave defendant's instruction number 2, reading as follows: "You are instructed that the burden of proving the presence of the defendant at the time and place of the alleged offense rests upon the Territory, and the prosecution must prove to your satisfaction and beyond a reasonable doubt that the defendant was present at the time of the alleged commission of the offense. The burden is not upon the defendant to prove that he was not present." There was no error in giving Territory's instruction number 5.

Assignment 35. The court gave the Territory's requested instruction number 6, reading as follows: "The court further instructs you, gentlemen of the jury, that if you find from the evidence in this case beyond a reasonable doubt that any defense set up by the defendant is a false and fabricated one and if you further find that such false and fabricated defense was purposely and intentionally invoked by the said defendant then you are instructed that such a false and fabricated defense forms the basis

of a presumption against him because the law says that he who resorts to perjury to accomplish an end, this is against him and you may take such action as the basis of a presumption of guilt." That this instruction may be given in a proper case, see *Territory* v. *Wong,* 30 Haw. 819. In the case at bar there was ample evidence justifying the giving of this instruction.

Assignment 36 is that the court erred "in the argument of the motion for a new trial to permit the prosecution to dispute the facts alleged in said motion and its accompanying affidavits after the prosecution had failed to file counter-affidavits." We are unable to find from the record that the trial court did as charged. However that may be, in the argument of the case in this court the prosecution certainly did not dispute the facts alleged in the motion for a new trial but argued purely upon the showing made by that motion.

Assignment 37 is that the court erred "in rendering judgment and sentence upon the guilt of the defendant upon said verdict as aforesaid." This raises no question not already considered.

It may be that the contention of the prosecution ought to be sustained, that many of the defendant's assignments of error are so ambiguous, insufficient and uncertain that they ought not to be considered. We have preferred, however, to consider them all on their merits, the same result being thereby reached. We find no error in the record. The judgment and the sentence are affirmed.

*J. V. Esposito* (*R. K. Murakami* with him on the briefs) for plaintiff in error.

*C. E. Cassidy,* First Assistant Public Prosecutor (*J. C. Kelley,* Public Prosecutor, with him on the briefs), for the Territory.