# STATE OF HAWAII *v.* WILLIS POLLARD BUTLER AND GEORGE P. SARANT.

## No. 4663.

MAY 22, 1969.

RICHARDSON, C.J., MARUMOTO, ABE, LEVINSON, JJ., AND CIRCUIT JUDGE HAWKINS ASSIGNED BY REASON OF VACANCY.

OPINION OF THE COURT BY ABE, J.

The following facts led to defendants' arrest and charge for disorderly conduct in violation of HRS § 772-2.[1]

On October 17, 1966, President Johnson was scheduled to deliver a foreign policy speech at an outdoor area near the Kennedy Theater at the East-West Center, on the University of Hawaii campus. As expected, a crowd started to gather hours before the time scheduled for the President's arrival. Within the crowd were numerous persons holding signs indicating their approval or disapproval of President Johnson and the United States policy relating to Vietnam. Particularly conspicuous was a large

---

[1] HRS § 772-2 reads:
"Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct:
(1) Uses offensive, disorderly, threatening, abusive or insulting language, conduct or behavior * * *."

effigy apparatus consisting of two man-size figures hanging from a crossbar.

As the crowd grew prior to the arrest, a group of eighteen "pro-Johnson" demonstrators carrying signs was seen weaving its way through the "anti-Vietnam" faction which was standing in the crowd with its protest signs and there was a "jockeying" for position between the two groups. By that time the crowd was solidly packed and it was difficult for anyone to move about.

The "anti-Vietnam" demonstrators were not received in a very gracious manner by some persons who were present. One such unidentified person was seen tearing down a sign held by an "anti-Vietnam" demonstrator. Another person was observed trying to rip a portion of a twenty-foot banner which read, "You are the Agressor." He released the banner and caused no more trouble upon being told by a police officer that he would be arrested if he did not do so. Only four specific statements which indicated anger felt by unidentified individuals viewing the "anti-Vietnam" materials were testified to by the State's witnesses out of the several thousand persons massed together.[2] There were also "mumblings" and "comments" such as "commies" and "pinkies" made by unidentified persons.

On cross-examination State witnesses admitted that these alleged statements and comments were made in a moderate tone of voice. There were no threats to fight or any fighting, nor were there any signs of violence or disturbance. The 130 Honolulu police officers on the site had no problem controlling the crowd and keeping order. The officer in charge felt confident that he could "handle the situation if anything [developed]."

_____

[2] The four statements were: (a) "If the police don't take the banners down, I'll take them down"; (b) "If they don't like it here why don't they go to Vietnam?"; (c) "Is this the way to welcome the President?"; (d) "This is a hell of a way to show Americanism."

The arrest of defendant Butler occurred in the following fashion as described by one of the State witnesses:

"Q. Now, taking from there, Sgt. Kanekoa, what if anything happened when you walked up to Dr. Butler?

"A. I approached Mr. Butler and asked him to please remove those effigies, and he looked at me and he says, 'What?' and he said, 'I will not,' and he walked to the effigies which was about six feet away from him.

\* \* \* \* \* \* \* \*

"A. He walked to the effigies and held on to one of the poles. I followed him and I again asked him to remove those effigies. He asked me why? I told him that these effigies were causing disturbance among the people there, and I asked him for the third time to remove those effigies, and he still refused.

"I told him that if he does not comply that he would be arrested, and he answered me, 'Go ahead and arrest me—what do you want to arrest me for?' I told him that I would arrest him for disorderly conduct. And then he looked at the crowd and he says, 'I am not disorderly; the police are disorderly.'

"Q. When he told that to you, was he facing you?

"A. No, he was facing the crowd.

"Q. Could you demonstrate to the jury how he made that statement?

"A. (Demonstrating) Well, as I was facing him he turned to the crowd, and he used his hand as a gesture and he said, 'I am not disorderly; the police are.'

"Q. What if anything happened after that?

"A. Then I warned him again to remove those effigies, and I still received a negative answer, and I arrested Mr. Butler for disorderly conduct."

\* \* \* \* \* \* \* \*

The arrest of defendant Sarant occurred in a similar fashion:

"Q. What if anything did you do when you approached George Sarant?

"A. I told him, 'Sarant, I am going to get the pole for evidence,' and he told me by what law? I told him that we were going to need it as evidence as Dr. Butler was arrested.

"As I reached over to retrieve the pole, Mr. Sarant brushed my hands aside.

"Q. Did George Sarant say anything at that time?

"A. Yes.

"Q. What if anything did he say?

"A. He said, 'people, look, look—police state—Gestapo.'

"Q. Did you have any reply to that?

"A. Yes.

"Q. What did you say?

"A. I told him to cease his actions—if he doesn't hand the pole over to me, I would have no other alternative but to arrest him.

"Q. And what if anything did you do?

"A. I reached over for the pole again, stepping forward to retrieve the pole.

"Q. What if anything happened?

"A. He put his hand out and stopped me.

"Q. When you say he put his hand out, how did he do that?

"A. Placed his hand against my chest.

"Q. And what if anything happened?

"A. I placed him under arrest.

"Q. You placed who under arrest?

"A. Mr. George Sarant.

"Q. For what did you place him under arrest?
"A. For being a disorderly person."

\* \* \* \* \* \* \* \*

At the close of the prosecution's case, the defendants moved for judgments of acquittal on the ground that the evidence adduced was insufficient as a matter of law to prove a charge of disorderly conduct. The court reserved its decision on the motion. This motion was renewed after the close of the defendant's case, but the court continued to reserve its decision on the motion.

The jury found the defendants guilty of disorderly conduct. Thereafter, the defendants again moved for judgments of acquittal. The motions were denied. The trial court adjudged the defendants guilty and the defendants appealed.

The State concedes that the activities engaged in by the defendants were lawful at the time the request was made to remove the effigies; however, the State contends that the responses to the police requests constituted the disorderly language and conduct from which a breach of the peace might have followed as the direct result.

Our examination of the State's evidence compels us to conclude that a conviction for disorderly conduct cannot be sustained.

Evidence that defendants argued with the police in an insolent and rude manner and that they refused to obey orders did not constitute disorderly conduct without additional evidence showing that a breach of peace was likely to occur. *Thompson* v. *City of Louisville*, 362 U.S. 199, 206 (1960). By touching the arresting officer Sarant did not commit the offense because the evidence fails to show that the touching was done in a violent, threatening or fighting manner. Also, we believe that the evidence was insufficient to show that a breach of the peace was

imminent. Although there were sporadic acts demonstrating disagreement on the part of those not sympathetic to the views of the "anti-Vietnam" demonstrators, evidence fails to show any violence or real threat of violence, any loss of control of the crowd or any fear in the minds of the policemen in charge that the situation would become uncontrolled. The most that can be said of the evidence in the appeal record here is that the defendants' conduct generated some mutterings of anger by some persons in the assembled audience.

Further, we believe that the legislature did not intend the actions of the defendants complained of and proven at the trial to constitute the crime of disorderly conduct. Otherwise it would be of little value to hold that one has a constitutional right to dissent peacefully and lawfully if it can be done only on pain of arrest and trial.

The United States Supreme Court held in *Terminiello* v. *Chicago,* 337 U.S. 1 (1949), that a speech which merely "stirred people to anger, invited public dispute, or brought about a condition of unrest" may not stand, and stated at page 4:

> "[A] function of free speech, under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why *freedom of speech* * * * *is* * * * *protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest.* * * * There is no room under our Constitution for a more restrictive view. For the alter-

native would lead to standardization of ideas either by legislatures, courts, or dominant political or community groups."

*Terminiello* was followed recently in *Tinker* v. *Des Moines Independent Community School District*, 393 U.S. 503 (1969). There, the court stated that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."

The appeal record here shows no more than that the defendants' conduct caused some persons in the assembled crowd to utter angry remarks. We cannot say from the evidence adduced that the defendants went beyond the permissible bounds of free speech defined in *Terminiello* and *Tinker* and, therefore, we hold they did not commit the offense of disorderly conduct.[3]

We hold that the State failed to marshal sufficient evidence to sustain a charge of disorderly conduct, and the trial judge erred in not having entered judgments of acquittal upon the conclusion of State's case.

Reversed and remanded with directions to vacate the judgments of guilt and to enter judgments of acquittal.

*James A. King* (*Bouslog & Symonds* of counsel) for defendants-appellants.

*Dennis A. Ing,* Deputy Prosecuting Attorney, City and County of Honolulu (*John H. Peters,* Prosecuting Attorney with him on the brief), for plaintiff-appellee.

*Richard P. Schulze, Jr.* (*Michael R. Sherwood* with him on the brief), for American Civil Liberties Union, amicus curiae.

CONCURRING OPINION OF LEVINSON, J.

I concur in the result reached by the majority. I believe, however, that the issues raised in this case are of

---

[3] Thus, it is not required that we rule on the constitutionality of the statute.

sufficient importance to merit further discussion.

Before proceeding, in fairness to the prosecution, I am compelled to fill in an egregious omission from the majority's statement of the facts. The effigy apparatus did not consist simply of two undifferentiated man-size figures hanging from a crossbar as the court's opinion implies. On the contrary, the effigies were very provocative in nature. One effigy, dressed in a cowboy hat and boots and labeled "LBJ", was hanging by its neck from a noose in a death-like stance. The other effigy, an armless figure dressed in khaki-colored clothing and wearing a military cap, was labeled "Pentagon" and was hanging by its neck from a rope in a similarly gruesome fashion. On the crossbar was a sign reading "NUREMBURG JUSTICE FOR WAR CRIMINALS." The defendants were among those maintaining control over the effigies.

Also it should be noted that, although there were at least 130 Honolulu Police officers assigned to the East-West Center, only ten of that number were assigned to confine their attention to the area where individuals were picketing.

A. *Reservation of Decision on Motion for Judgment of Acquittal.*

An apparent error was committed by the trial judge, although it was not specified as such by the defendants. The Hawaii Rules of Criminal Procedure do not appear to provide for the reservation of a decision on a motion for judgment of acquittal which is made following the close of the prosecution's evidence. See H.R.Cr.P., Rule 29(a). The only provision in the rules for reservation of decision relates to a motion made following the close of all the evidence. H.R.Cr.P., Rule 29(b). It would seem, therefore, that all motions for judgment of acquittal made at the close of the prosecution's evidence should be decided by the judge before the trial continues. If the evidence pre-

sented by the prosecution is insufficient to sustain a conviction, the State has not met its burden of proof, and I have serious doubts about forcing a defendant in such circumstances to go through the needless and burdensome task of meeting the charges against him. *See Jackson* v. *United States,* 250 F.2d 897 (5th Cir. 1958).

B. *Test on Appeal in Criminal Cases.*

The majority has concluded, correctly in my opinion, that "the State failed to marshal sufficient evidence to sustain a charge of disorderly conduct." There is, however, a large gap in its analysis of this case. Nowhere is it indicated what the test is and how it was applied by the court to arrive at its conclusion. The fact that defense counsel in this case (or in any other case in recent times) has not had the foresight to pinpoint this issue for our consideration does not give us reason to ignore it. In any criminal case on appeal where the question of sufficiency of the evidence to support a conviction comes into play, a necessary concomitant is a test which considers the evidence in a light most favorable to the prosecution and measures it against a legal standard which should have been met before the jury was permitted to decide upon the guilt or innocence of a defendant. If the practicing bar is not given the needed guidance on what the test is and how it is to function, how can we expect defense counsel to isolate properly and discuss the relevant issue in appealing a client's conviction? Vague, generalized, and porous opinions emanating from this court can only confound, not clarify. It is not enough to decide cases strictly on a case-by-case basis using unknown standards or those known only to ourselves as judges; we must strive for known clarity and consistency.[1] I think we are derelict in

[1] It is time that appellate counsel bring this question squarely before us so that we may emerge from the fog banks of avoidance to the sunshine of enlightenment.

our duty if we delay any longer the needed clarification.

A perusal of this court's opinions which state the test to be applied in reviewing a conviction discloses a singular lack of precision in describing what the test is. It has been recently described as simply "whether there is substantial evidence to support the verdict." *State* v. *Kekaualua,* 50 Haw. 130, 132, 433 P.2d 131, 133 (1967) ; *State* v. *Cummings,* 49 Haw. 522, 533, 423 P. 2d 438, 445 (1967). However, in *Cummings,* this court repeated with approval the test given in *State* v. *Carvelo,* 45 Haw. 16, 33, 361 P.2d 45, 54 (1961) as follows: "a jury verdict in any case involving conflicting evidence and depending on the determination of credibility of witnesses or the weight of the evidence is invulnerable when attacked on appeal if there is any *substantial evidence amounting to more than a mere scintilla* tending to support the findings necessary to the verdict rendered." (Emphasis added.)[2]

Today I would reaffirm the rule that a jury verdict of guilty must be accepted by the appellate court if its findings are supported by "substantial evidence." However, I believe the use of the term *more than a mere scintilla* in describing the nature of *substantial evidence* is confusing and should hereafter be avoided. The two phrases are patently inconsistent. Black's Law Dictionary (Rev. 4th ed. 1968) defines "scintilla of evidence" as "a metaphori-

---

[2] Numerous variations of the scintilla rule have been stated in the following Hawaii cases:

Territory v. Lam Bo, 23 Haw. 718, 719 (1917)
Territory v. Young, 32 Haw. 628, 634 (1933)
Territory v. Legaspi, 39 Haw. 660, 664 (1953)
State v. Foster, 44 Haw. 403, 409, 354. P.2d 960, 964 (1960)
State v. Sorenson, 44 Haw. 601, 610, 359 P.2d 289, 294 (1961)
State v. Carvelo, 45 Haw. 16, 33, 361 P.2d 45, 54 (1961)
State v. Yoshino, 45 Haw. 206, 219, 364, P.2d 638, 646 (1961)
State v. Hassard, 45 Haw. 221, 231, 365 P.2d 202, 207 (1961)
State v. Arena, 46 Haw. 315, 324, 379 P.2d 594, 601 (1963)
State v. Cummings, 49 Haw. 522, 534, 423 P.2d 438, 445 (1967)

cal expression to describe a very insignificant or trifling item or particle of evidence." "More than a scintilla" has been equated by this court to "more than a mere trifle or suspicion of guilt of the offense charged." *Territory* v. *Legaspi,* 39 Haw. 660, 664 (1953). It would appear that comparing substantial evidence with words which mean an insignificant quantum is to use anomalous rhetoric.

Furthermore, the test on appeal in criminal cases as heretofore applied by this court does not seem to be accurately described by the label *substantial evidence amounting to more than a mere scintilla.* The present case is a good example. The court's opinion as supplemented by mine recites a detailed description of relevant and material evidence introduced for the purpose of showing disorderly conduct. There were the provocative and distasteful effigies surrounded by a solidly packed crowd containing sharply divided factions. The pro-Johnson demonstrators were obviously not sedentary or altogether peaceful. They were weaving their way through the crowd en masse and were jockeying with the anti-Vietnam group for a position close to the speaker's stand. Some of their number tore down anti-Vietnam signs and attempted to rip an anti-Vietnam banner. There were angry mutterings and comments. There were only ten policemen assigned to the area containing the pickets. There was a physical contact between Sarant and a police officer initiated by the former in his efforts to resist the police seizure of the effigies. It is not inconceivable that the responses by the defendants to the police requests and the continued display of the effigies might have triggered an uncontrolled disturbance among the people gathered. There is some evidence to support such a conclusion. A fair appraisal of the evidence would, in my opinion, result in a finding that there was more "than a mere trifle" of evi-

dence to show a serious disturbance was imminent, *i.e.* that there was more than a mere scintilla to support the charge. And yet, the court reverses the convictions while leaving the scintilla rule unscathed and intact. If my brothers feel that "the State failed to marshal sufficient evidence to sustain a charge of disorderly conduct" because there was not more than a scintilla of evidence to sustain the charge, I submit that they are using the phrase "more than a mere scintilla" as an undefined term of art whose meaning can only be that which is more than a quantum which itself is more than a literal scintilla. It is this sort of paradox which demonstrates the uselessness and confusion resulting from the continued existence of the scintilla rule.

The "substantial evidence" required to support the jury verdict of guilty ought to be that which would justify a reasonable trier of fact in finding that the defendants were guilty of the crime charged beyond any reasonable doubt.[3] A significant number of other jurisdictions follow this rule. See, for example, *United States* v. *Hall,* 396 F.2d 841, 844 (4th Cir. 1968) ; *Nagell* v. *United States,* 392 F.2d 934, 935 (5th Cir. 1968) ; *People* v. *Bassett,* 70 Cal. Rptr. 193 at 203-04 (1968). In one case, *Territory* v. *Gagarin,* 36 Haw. 1 (1941), this court used unambiguous language in clearly explaining the characteristics of the evidence required to sustain a verdict. The court said that a reversal is not required if there was "substantial, competent evidence before the jury from which reasonable men, acting conscientiously and with a desire to arrive at the truth and do justice, could believe beyond a reasonable doubt that all of the elements of the crime charged were established." 36 Haw. at 5. Unfortunately, the wis-

---

[3] See my concurring opinion in State v. Kekaualua, 50 Haw. 130, 134, 433 P.2d 131, 134 (1967) for another discussion of this concept.

dom of this case has been left fallow in the years following that opinion.

The term *substantial* evidence cannot be the equivalent of *any* evidence. The evidence must be reasonably capable of being believed so that it is "of ponderable legal significance," *In re Teed's Estate,* 112 Cal. App. 2d 638, 644, 247 P.2d 54, 58 (1952).

As long as there is a reasonable doubt as to guilt remaining at the close of the evidence, the prosecution has failed to discharge its burden of proof. Therefore, the trial court is in error if it denies a motion for judgment of acquittal in such circumstances.

This approach does not require the appellate court to reconcile conflicting evidence, a practice proscribed by *Territory* v. *Ebarra,* 39 Haw. 488, 492 (1952), nor does it require us to interfere with a jury decision based on the determination of the credibility of witnesses or the weight of conflicting evidence, *State* v. *Carvelo,* 45 Haw. at 33, 361 P.2d at 54. It looks only to the legal sufficiency of the evidence to meet the required standard, assuming full weight is given to the evidence most favorable to the prosecution.

I recognize that this court has always shown a healthy respect for stare decisis and that the argument can be made that the scintilla rule has been given eternal life. I think this court should reject any "doctrine of disability at self-correction." *Helvering* v. *Hallock,* 309 U.S. 106, 121 (1940). Stare decisis does not command that we perpetuate our errors.

### C. *Conduct of the Defendants.*

The State contends that the responses to the police requests constituted the disorderly language and conduct from which a breach of the peace might have followed as the direct result. In applying the foregoing test to the

evidence as discussed in the court's opinion and supplemented herein, a reasonable trier of fact would certainly have had a reasonable doubt as to the guilt of the defendants.

Since it is conceded by the State that the activities engaged in by the defendants were lawful at the time the request was made to remove the effigies, the request by the officer can be viewed only as one which had no force of law to compel compliance.[4] It can be seen as no more than an attempt to exercise autocratic power by fiat. To call the subsequent arrests "due process of law" would be a diaphanous euphemism. "Laws . . . are to be made by representatives chosen to make laws for the future, not by police officers whose duty is to enforce laws already enacted and to make arrests only for conduct already made criminal. . . . To let a policeman's command become equivalent to a criminal statute comes dangerously near making our government one of men rather than of law." *Gregory* v. *Chicago,* 89 S.Ct. 946, 951 (1969). (Concurring Opinion of Black, J.).

Even though the police requests had no legal force behind them, a negative response could, conceivably, have constituted disorderly conduct if the response had been made with the intent or likelihood that a breach of the peace would result from it. However, there is no evidence showing such intent and insufficient evidence to show the likelihood in this case. The refusal to obey a police order per se cannot constitute disorderly conduct. *People* v. *Smith,* 19 N.Y.2d 212, 278 N.Y.S.2d 832, 835 (1967).

That the defendants earnestly and vigorously protested

---

[4] The State conceded this point by inference in oral argument when it agreed that the arrests would not have been justified if the defendants had politely and quietly declined to remove the effigies when asked.

their impending incarceration is not to be doubted. But these protests were nothing more than many spirited innocent persons would naturally offer, and they cannot be made to justify an illegal arrest. There was no threatening, abusive or obscene language used by the defendants. There were only queries and protests against the police action.

### DISSENTING OPINION OF HAWKINS, CIRCUIT JUDGE.

I respectfully dissent.

The ugly acts of the defendants that occurred on the campus of the University of Hawaii prior to the arrival of the President of the United States would incite any red-blooded American to violence. To prevent this from happening, the police officer made the arrests that are now being challenged. In my opinion, questions of fact were posed for the jury's determination.

I would affirm the jury's verdict of guilty as charged.