# STATE OF HAWAII *v.* EUGENE ROY ARENA.

## No. 4264.

February 28, 1963.

Tsukiyama, C. J., Cassidy, Wirtz,
Lewis and Mizuha, JJ.

OPINION OF THE COURT BY CASSIDY, J.

The defendant (appellant) was convicted, after a jury trial, of negligent homicide committed in violation of R.L.H. 1955, § 291-10,[1] under an indictment charging, in material part, that: "On or about the 22nd day of December, 1960, in the City and County of Honolulu, State of Hawaii, EUGENE ROY ARENA, while operating a Chevrolet automobile, * * * in the Ewa direction on Kala-

---

[1] § 291-10. *Negligent homicide.* "Every person who by the operation of any vehicle in a careless, reckless or negligent manner, but not wilfully or wantonly, causes the death of another, shall be guilty of the crime of negligent homicide * * *."

nianaole Highway, * * * and while in the process of overtaking motor vehicles also traveling in the same direction on said Kalanianaole Highway, did carelessly and negligently, but not wilfully or wantonly, operate said automobile at a speed greater than was reasonable and prudent under the conditions, thereby causing it to strike and collide with a Cadillac automobile, * * * operated by CHARLES HERBERT KARLSTAD, who was emerging in the makai direction from a private driveway at 5492 Kalanianaole Highway * * * thereby causing the said Charles Herbert Karlstad * * * to suffer certain wounds and injuries from which he did die * * *."

The defendant has appealed the conviction and states that the questions presented for this court are:

"1. Did the Circuit Court err in refusing to grant Defendant's Motion for Judgment of Acquittal (Tr. 189 and 197) and in refusing to give Defendant's Requested Instruction No. 1 with regard to a directed verdict? (Tr. 199.)

"2. Did the Circuit Court err in refusing to give Defendant's Requested Instruction No. 20 (Tr. 220) and in giving Court's Instructions No. 2 and No. 16 relating to the definition of 'a concurring proximate cause' over Defendant's Objection? (Tr. 193, 221.)"

Before considering the question relating to the sufficiency of the evidence, it should be noted that the applicable statute (§ 291-10) covers the death of another resulting from the negligent operation of a vehicle. To sustain a conviction under the statute, only ordinary negligence on the part of the offending operator is required to be proven. *People* v. *Campbell*, 237 Mich. 424, 212 N.W. 97, 99; *State* v. *Wojahn*, 204 Ore. 84, 282 P.2d 675. Further, while contributory negligence of the person killed should be considered in determining whether the accused was culpably negligent, it is not a defense to the charge. *People*

v. *Campbell, supra; Territory* v. *Kaupu,* 35 Haw. 396, 400.

The collision resulting in Karlstad's death happened about 5 :30 P. M. It occurred approximately in the middle of the roadway directly opposite the Kokohead (easterly) boundary of a private driveway leading from a residence on the mauka (northerly) side of Kalanianaole Highway. The paved portion of the highway at this point is 30 feet wide and is divided into three marked lanes 10 feet in width. Between the boundary line of the adjoining premises and the pavement is a shoulder 15 feet wide.

The defendant was driving a Chevrolet sedan in an Ewa (westerly) direction toward Honolulu. The deceased was driving a Cadillac sedan and was emerging from the private driveway. Defendant's car left skid marks down the middle of the center lane a distance of 135 feet to the point of impact. Testimony and photographs in evidence show that the front left side of the Cadillac was hit by the front of the Chevrolet. The Cadillac was shoved sideways and came to rest in the center lane facing makai (south), with its left front wheel 32 feet and its left rear wheel 22 feet from the point of impact. The Chevrolet came to rest facing in the same direction parallel to and 4 feet from the Cadillac. The Cadillac left two heavy tire marks 1½ feet long on the pavement, the one on the left being 5 feet and the one on the right 6 feet from the edge of the pavement. The speed limit in the area was 35 miles an hour.

The defendant testified that when he came to the three-laned portion of Kalanianaole Highway he passed one line of 3 or 4 cars, pulled into the right lane for a while, and then cut back into the middle lane and proceeded to pass another line of 2 or 3 cars and a truck, and that as he passed the truck and was pulling into the right lane ahead of it the Cadillac pulled out across the highway, and that he tried to swerve to the left and "jumped" on his brakes,

but could not stop in time to avoid the collision. He testified he estimated he was traveling at from 45 to 50 miles an hour as he passed the truck.

The evidence is conflicting on the exact number of vehicles in the last line defendant was passing or had passed but the evidence fully bears out that there were at least 3 or 4 automobiles and a truck in the mauka lane immediately before the collision.

The decedent's widow testified she and her husband were on their way to a reception and were a short distance from home when it was discovered she didn't have her gloves, so, he stopped the car, backed into the driveway, and was attempting to make a left turn after emerging from the driveway, in order to return home, when the collision occurred.

The principal conflict in the evidence was in the difference in the testimony of decedent's widow and that of Robert W. Scott respecting the manner in which the Cadillac entered the highway.

Scott testified that he was traveling in a Kokohead direction away from Honolulu and that the Cadillac did not make a stop before proceeding onto the highway. He said that the sudden emergence of the Cadillac required him to come to "a rather abrupt stop" and that the cars proceeding in the mauka lane toward Honolulu came to "a very abrupt stop." The witness testified that there were not more than 4 cars in back of the truck and that there were 3 or 4 cars in front of it and that the defendant did not make and could not have made an attempt to get back into his right hand lane because "the cars weren't spaced far enough to get in there."

Mrs. Karlstad testified that her husband had brought the Cadillac to a "dead stop" at the edge of the pavement before proceeding into the highway. She said she looked to the right and saw no cars, that her husband proceeded

to enter the highway and that they were more than half-way across the highway when they were struck.

There was also conflicting evidence before the jury on whether the deceased may have been under the influence of intoxicating liquor.

Summarized, the grounds stated for the motion for acquittal at the close of the case were: (1) That under the rule that a person using a public highway has the right to presume that others using the highway will do so in a lawful manner the defendant was under no legal duty to anticipate that the deceased would emerge from the private driveway illegally or in violation of the defendant's right of way; (2) That the defendant, under the applicable ordinance, had the right of way; (3) That even if there was a conflict in the evidence on the point as to whether the decedent stopped before entering the highway, there could be no conflict in the testimony that he emerged unsafely onto the highway; and (4) That there was no evidence to show that if the defendant had been traveling at the legal rate of 35 miles per hour when the deceased's car first came into view, that is, when defendant came past the truck, defendant could have, by the exercise of ordinary care, stopped his car in time to avoid the collision. The same points are presented and argued on appeal.

The only authority cited by appellant in support of the contention that the evidence in this case was insufficient to sustain the verdict is *Greyhound Corp.* v. *Sparks,* 5 Cir., 283 F.2d 44, in which the appellate court reversed the district court's decision holding the Greyhound Corporation liable, in a survival action, for the death of one John Sparks resulting from an intersection collision between an automobile, in which he was a guest passenger, and one of the defendant corporation's buses. The automobile was traveling north on State Highway 19. The

undisputed evidence showed that the automobile ran a "Stop" sign at a speed in excess of 40 miles an hour and collided in the intersection with the Greyhound bus which was traveling west on U.S. Highway 78. The bus likewise was traveling at a speed in excess of 40 miles an hour. The evidence also showed that neither operator could observe the other vehicle until within 50 feet of the intersection by reason of the high terrain, topped by trees and undergrowth, in the area of the southeast quadrant formed by the intersection. The lower court found that the state statutes required the bus, on approaching the intersection, to slow down and to sound its horn, and also that under the law, because of his excessive speed, the operator of the bus might have lost his right of way over the automobile. It found further that if the bus operator had been driving at a reasonable rate of speed and had kept a reasonably alert lookout, he could have applied his brakes or turned his bus to the right to avoid the collision. The lower court held the bus driver to have been negligent, and that such negligence constituted a concurring proximate cause of the collision and Sparks' death.

The conclusions and findings of the district court were rejected by the appellate court, which stated (at p. 48): "It seems to us that these erroneous conceptions of law obscured the thinking of the district court. When they are corrected, it becomes obvious, and capable of almost mathematical demonstration, that the sole proximate cause of the collision was the negligence of the driver of the automobile."

Appellant contends that the *Greyhound* case is on all fours and quotes from the opinion (at pp. 48, 49) as follows:

"The driver of the bus was under no legal duty to anticipate that an automobile would violate the law and without stopping enter the main traveled or

through highway on which the bus was traveling. No such danger could be reasonably foreseen and, as a matter of law, common prudence did not require the bus driver to sound his horn.

\* \* \*

"The district court found that the automobile failed to stop for the 'Stop' sign at the south entrance to this intersection. The court also found that the automobile entered the intersection at 'a speed no less than 40 miles per hour' (nearly 60 feet per second). Thus, had the bus driver been totally alert and observed the car the instant it became visible, he would have seen it for a maximum time of five-sixths of a second before the collision. Even then, until some time elapsed in which the bus driver could estimate the speed of the automobile, he could assume that it would stop before entering the through highway. A fraction of a second additional time would be required for what the bus driver perceived with his eyes to be translated into a motor response. Before that time elapsed, the collision would have occurred.

"*Hence, if the bus driver had been traveling at the legal rate of speed (40 m. p. h.) and on an alert lookout, he could neither have stopped his vehicle nor otherwise have avoided the collision. Clearly, then, the admitted negligence of the driver of the automobile was the sole proximate cause of the death of Johnny Sparks.*" (Appellant's emphasis.)[2]

We are told that we either have to disagree with the Fifth Circuit or apply the principles of law pronounced by it and enter a reversal in this case. However, we do not find the choice that restricted. It is wholly immaterial and unnecessary to state whether we agree with

_____

[2] Appellant designates the emphasized portion of the opinion as the "rule of the *Greyhound case.*"

the opinion of the Fifth Circuit Court or favor the reasoning of the district court's opinion[3] since the case appears to be clearly distinguishable on several counts.

In our opinion the facts in our case and those involved in *Greyhound* are not sufficiently comparable to warrant the application here of the ultimate conclusion reached in *Greyhound* by the process of reasoning labeled by appellant as the rule of that case.

In *Greyhound* a key factor affecting the appellate court's ruling was the lack of opportunity on the part of the bus driver to observe the other vehicle until within 50 feet of the intersection due to the obstruction of view caused by the terrain of the area adjoining the southeast corner of the intersection. No such physical obstruction existed in this case and the defendant saw the Cadillac when it was more than 135 feet away.

Another important factor in the *Greyhound* decision was that the undisputed evidence showed that the driver of the automobile colliding with the bus failed to stop at the intersection as he was required to do by law. In this case the evidence is in conflict on whether the Cadillac had been brought to a stop before entering Kalanianaole Highway. Also, the Fifth Circuit found, under its interpretation of the applicable Alabama statute, that irrespective of his speed the operator of the bus could not be deemed to have lost his right of way, possessed as a driver of a vehicle on a main traveled or through highway, over a vehicle approaching the intersection from his left. As will be noted later, we cannot construe or apply the ordinance under which Arena claims he had the right of way with like effect.

The appeal in the *Greyhound* case was in a civil action from specific findings of fact and conclusions of law. The

---

[3] *Sparks* v. *Southeastern Greyhound Lines*, N.D. Miss., 173 F.Supp. 896.

Fifth Circuit, after rejecting the lower court's conclusions of law, was able to reduce the whole case to a single ultimate question on proximate cause, and solve that question, as it stated, by "almost mathematical demonstration." The appeal here is from a general verdict, resting on the jury's reconciliation of conflicting evidence. It is not possible under the evidence in this case to override the jury and exculpate the defendant by deductive reasoning capable of mathematical demonstration. The ultimate question before us is simply whether or not it can be found from an analysis of the particular facts in the record of this case that there was substantial evidence amounting to more than a scintilla to sustain the jury's verdict. *State v. Hassard,* 45 Haw. 221, 365 P.2d 202; *State v. Foster,* 44 Haw. 403, 354 P.2d 960. In making the analysis for that purpose we do so on the basis that the resolution of all conflicts in the evidence rested with the jury and not this court. *State v. Carvelo,* 45 Haw. 16, 361 P.2d 45; *Johnson v. Sartain,* 46 Haw. 112, 375 P.2d 229. And that the evidence must be viewed in the light most favorable to the State. *State v. Yoshino,* 45 Haw. 640, 372 P.2d 208.

Before considering the evidence bearing on what we deem the crux of the case, the defendant's extreme speed, we state that we do not consider there is anything in the *Greyhound* case which supports appellant's contention that there is a fatal defect in this case by reason of the prosecution's failure to have introduced evidence showing that if the defendant had been traveling at 35 miles an hour he could have, by the exercise of ordinary care, stopped his car in time to avoid the collision. No other authority is cited in support of the contention and it is our opinion that there can be no logical basis for holding that the prosecution was required to negative this purely hypothetical proposal and defense theory by direct proof. As will be seen later, the contended theory of defense can have no application to this case.

The first observation of the manner in which defendant was operating his automobile was by a police officer who testified that while he was traveling in a Kokohead direction on Kalanianaole Highway, in the vicinity of Paiko Drive,[4] a car, later identified as defendant's Chevrolet, "came towards me at a very, very high rate of speed." He said: "This car was traveling approximately down the center line of a two-lane highway. It was passing cars traveling in the same direction, also forcing the cars in the lane of traffic that I was in, to the side of the road." The officer further said he was forced to the shoulder of the road, that he blew his horn, waved his arms and shouted to the driver to slow down, but without avail. He then radioed to other police officers following in a car closer to Honolulu to stop the Chevrolet that was traveling toward them, as he said, "at such a high rate of speed."

Several occupants of cars which the defendant passed prior to the collision gave general testimony that the speed of defendant's car was so excessive as to attract particular attention. One of these witnesses said he was in a line of 15 cars and that the Chevrolet passed him at a high rate of speed and that—"he just went straight down passing all the cars," and that the unusual thing he noticed about the Chevrolet was its sound—"It was souped up."[5] Another witness testified that his attention was directed to the Chevrolet by reason of its speed and "Its noise, its loud noise from the motor and the exhaust pipes." A third witness said that the Chevrolet "came past us going at a pretty fast rate of speed." The driver of the car following the truck said that as the Chevrolet passed, she "heard a whining engine, and all the passengers in the

---

[4] Paiko Drive is about 1½ miles beyond the scene of the collision. Kalanianaole Highway is two-laned in this area.

[5] The defendant's 1957 car was equipped with a 1958 or 1959 Impala motor having triple carburetors.

car looked to see. And then he passed by." She estimated the speed of the Chevrolet at "somewhere around 60 or 65."

As has been noted, the defendant testified he estimated he was traveling at from 45 to 50 miles per hour as he passed the truck. A police officer testified that the defendant told him, at the Queen's Hospital shortly after the collision, that he "passed this truck at the speed of what he believes to be 55 to 60 miles an hour."

Another factor indicating the defendant's excessive rate of speed was the skid marks laid down by the Chevrolet for a distance of 135 feet before the point of impact. His contention on the point is that "the length of the skid marks in the absence of expert testimony is of no probative value." It is insupportable. Skid marks are pertinent and may be properly considered by a jury in connection with other evidence whenever speed is in issue. See Annot., 23 A.L.R.2d 112, § 7, at p. 125.

In this case the location of the skid marks practically down the center of the middle lane also had some probative force tending to refute the defendant's testimony that after he passed the truck he was pulling into the mauka lane and to corroborate Scott's testimony that the defendant made no such maneuver.

Further, we think appellant is precluded from claiming that there was no expert testimony respecting the skid marks by reason of his oral stipulation at the trial: "That Police Officer Harold H. Tanaka, if called to the stand to testify, would testify that at the time of the accident he was assigned to the traffic accident investigation bureau, and that after the accident of December 22, 1960, he determined, based upon charts, that the defendant's car was proceeding at approximately 50 to 55 miles an hour just prior to the accident." While the stipulation lacks the detail that, hindsight indicates, it should have

included, or that undoubtedly could have been furnished by testimony of the officer, the fair inference, nevertheless, is that the stipulated estimate of speed was based on the length of the skid marks.

Another item indicative of the high rate of speed at which the defendant was traveling was the evidence on the distance the decedent's Cadillac was shoved sidewise after the impact. As with the skid marks, the jury did not need the aid of expert testimony to appreciate the significance of this evidence. *Frank* v. *Stiegler*, 250 Minn. 447, 84 N.W.2d 912, 916; *Engel* v. *Interstate Transit Co.*, 9 Wash.2d 590, 115 P.2d 681, 683.

It is certain that immediately before the collision the defendant was traveling at a speed greatly in excess of the 35-mile limit. His judicial admission alone permits a finding he was traveling at 50 miles per hour. The full evidence in the case, however, warrants a conclusion that he was traveling at least 5 or 10 miles per hour over that rate.

As appellant urges (and the jury was instructed), speed alone does not establish negligence. Whether speed constitutes negligence depends on the attending circumstances. "It is not the rate of speed or velocity with which a car is traveling that determines whether it is being driven heedlessly or not. A high rate of speed upon a broad highway, at the time unoccupied, and which causes no danger to life or property, might not be heedless driving, while a much lower rate of speed upon a narrow highway, upon which other vehicles are standing or traveling, especially at night, whereby life is endangered, would be, under the statute, heedless driving. The charge of the court, given to the jury, left to them the determination of the reasonableness of the actions of the defendant, under all of the surrounding circumstances, and this we regard as proper." *Territory* v. *McGregor*, 22 Haw. 786, 793. See

5A Am. Jur., *Automobiles,* § 1182, p. 985. It is beyond doubt that defendant's extreme speed judged in the light of the attending circumstances of this case—his endeavoring to pass a close line of several vehicles on his right on a confined three-lane highway with traffic also coming from the opposite direction—constituted negligence. The verdict therefore clearly withstands the challenge to the sufficiency of the evidence unless there is merit to appellant's contention that he should be absolved by reason of Karlstad's actions.

As has been noted, appellant's contentions in the last respect are, in effect: (1) That he had the right to assume that others would be using the highway in a lawful manner; (2) That he had the right of way over Karlstad; and (3) That notwithstanding the conflict in the testimony as to whether Karlstad first stopped before he entered Kalanianaole Highway, there can be no conflict on the point that he did enter the highway unlawfully and unsafely.

On defendant's offer, there was admitted in evidence the portions of the City and County of Honolulu Traffic Code (Ordinance 1508) defining "right of way" as, "The privilege of the immediate priority of the use of the roadway," (§ II, ¶ 5), and providing: "The driver of a vehicle emerging from [a] . . . driveway . . . shall stop such vehicle immediately prior to driving . . . onto the sidewalk area extending across such . . . driveway . . . , and upon entering the roadway, shall yield the right-of-way to all vehicles approaching on said roadway." (§ XII, ¶ 2). It is by virtue of these provisions of the ordinance appellant argues that there could be no question but that the deceased emerged unlawfully and unsafely into the highway. We do not agree.

The testimony of Mrs. Karlstad, if believed, permitted the jury to conclude that her husband complied with the

requirement of stopping at the edge of the highway. Though the ordinance then required him to give all vehicles approaching on the highway the privilege of priority in the use thereof, time and space in light of the existing circumstances determine what constituted such priority since, as the definition of right of way indicates, it is only the privilege of *immediate* priority to use of the highway that the favored vehicle is entitled to. " 'Right of way' merely means a preference to one of two vehicles asserting the right of passage at the same place and at approximately the same time." *Cowan* v. *Market St. Ry.,* 8 Cal. App. 2d 642, 47 P.2d 752, 754. Under the ordinance he was not required to wait for all approaching vehicles to pass by. His obligation to yield applied only to approaching vehicles that were too close to permit him to complete his turn with safety. "The operator of the emerging vehicle is required to yield the right of way only to those who are lawfully approaching and who are so near that such operator cannot safely enter the highway." 60 C.J.S., *Motor Vehicles,* § 347, p. 811. If, after he stopped at the edge of the pavement, Karlstad observed and was justified in concluding he could complete his left turn without endangering the cars approaching from either direction, he was under no obligation to yield and his attempt to make a left turn would not have constituted either a violation of the right of way ordinance or an unsafe movement. "When a driver on a private road approaches an intersection, stops, and looks in both directions for approaching traffic on the public highway, acting as a reasonably prudent person exercising due care would act, he is not negligent as a matter of law if he attempts to enter the intersection under the belief that he has time and opportunity to cross safely. He is only required to yield the right of way to those lawfully approaching so near the intersection that he cannot safely enter it." *Temple*

v. *Ellington*, 177 Va. 134, 12 S.E.2d 826, 828. On the evidence, the question of whether or not the proximity of the oncoming traffic required Karlstad to yield the right of way was clearly open for the jury's determination. *Hicks* v. *Gillespie*, 346 Mich. 593, 78 N.W.2d 145, 148.

In urging the point under consideration, appellant makes much of the testimony of Scott to the effect that the approaching vehicles had to come to an abrupt stop in order to avoid colliding with the Cadillac. However, we think this feature of the evidence is open to an interpretation other than that placed on it by appellant, as it was entirely reasonable for the jury to conclude that the approaching cars were required to be brought to a stop, not because Karlstad was endeavoring to cross the highway for a left turn, but rather by reason of the fact, as borne out by the two heavy tire marks left by the wheels of the Cadillac, that he braked his car to a stop in their path when he was suddenly confronted with the unexpected emergency of defendant's speeding car bearing down upon him in the center lane.

Also in connection with the analysis of the evidence as it pertains to appellant's contention that Karlstad violated the right of way provisions of the ordinance and emerged unsafely, it must be recognized that, if he emerged lawfully, Karlstad himself was entitled to assume that others using the highway would do so lawfully. *Divita* v. *Atlantic Trucking Co.*, 129 W.Va. 267, 40 S.E.2d 324, 330; 5A Am. Jur., *Automobiles*, § 306, p. 421. If operating lawfully himself, he was not required to anticipate that he would encounter any car being operated at an excessive speed. *Temple* v. *Ellington, supra,* 177 Va. 134, 12 S.E.2d 826, at p. 830. See also *Hicks* v. *Gillespie, supra,* 346 Mich. 593, 78 N.W.2d 145, 148.

In view of the foregoing and the conflict in the evidence on whether Karlstad stopped at the pavement before en-

tering the highway, it cannot be found, as appellant contends, that as a matter of law the deceased emerged unlawfully or unsafely onto the highway. See *McDougall v. Morrison,* 55 Cal. App. 2d 92, 130 P.2d 149.

Moreover, whether Karlstad emerged unlawfully or unsafely has relevance only as it bears on the question of defendant's negligence, particularly on whether he had the right to assume that nobody would emerge from a private driveway under the circumstances obtaining at the time. Defendant had no such right. The rule permitting a driver to assume that others will observe the rules of the road is subject to limitations. It affords no escape hatch for one violating the law himself. *Mooney* v. *McCarthy,* 107 Vt. 425, 181 Atl. 117, 119. It may not be invoked to excuse a driver from the consequences of his own negligence. *Nesbit* v. *Everette,* 5 Cir., 243 F.2d 59, 63.

In *Cushing Refining & Gasoline Co.* v. *Deshan,* 149 Okla. 225, 300 Pac. 312, it is stated at p. 317: "The rule that a person traveling upon a highway has a right to assume that all other persons using the highway will obey the law and that one is not bound to keep a lookout for others who may violate the law applies only to those cases where the automobile is being driven in conformity to the law and not in violation thereof, and it has no application where the automobile is being driven in a negligent manner, where it is not properly equipped with lights, or where it is being driven at an excessive rate of speed. In those instances the primary negligence of the driver of the automobile renders inoperative the rule stated."

In *Skaggs* v. *Gypsy Oil Co.,* 169 Okla. 209, 36 P.2d 865, at p. 869 it is said that the rule "of course has no application to one who is operating an automobile in a negligent manner." And in *Washington* v. *Kemp,* 97 Ga. App. 235, 102 S.E.2d 910, at p. 913, that "this rule does not apply to one who is himself violating the law relating

to traffic on the highways, and this being true, it was incumbent upon [him] to anticipate that others, like [himself], might disobey the traffic laws and regulations."

With the clearly established flagrant violation of the speed limit, it is obvious that defendant's claim of refuge under the rule merits little, if any, consideration. We think the same is true with respect to defendant's contention that he was shielded by having the right of way.

In this jurisdiction a right of precedence given under the provisions of the Traffic Code is not absolute and cannot be exercised with impunity under all circumstances. *Mossman* v. *Sherman*, 34 Haw. 477, 481. See also *Bunhichi* v. *Honolulu Rapid Transit & Land Co.*, 18 Haw. 475, 479; *Fuller* v. *Honolulu Rapid Transit & Land Co.*, 16 Haw. 1, 4. It cannot be maintained, therefore, as the Fifth Circuit Court held in respect to the bus operator in the *Greyhound* case, that Arena was entitled to the right of way irrespective of his excessive speed. The rule applicable here is that stated in *Satterlee* v. *Orange Glenn School Dist.*, 29 Cal. 2d 581, 177 P.2d 279, at p. 284, as follows: "* * * an operator of a motor vehicle cannot arbitrarily rely upon the right of way gained as a result of excessive speed or by other negligent act or violation of the law." See also *Erdahl* v. *Hegg*, N.D., 98 N.W.2d 217, 221; *Lund* v. *Western Union Tel. Co.*, 192 Wash. 579, 74 P.2d 220, 223; *Farmer* v. *Fuller*, 331 Ill. App. 615, 73 N.E.2d 457.

We have observed that contributory negligence is not available as a defense in this case. It has been shown that there is nothing in the manner in which the deceased operated his car which as a matter of law would relieve the defendant from responsibility. Defendant's speed under the attending circumstances revealed by the record was clearly negligence. Whether his negligence was a proximate cause of Karlstad's death was for the jury to

determine. *Ward* v. *Inter-Island Steam Navigation Co.*, 22 Haw. 66, 71; *Yellow Cab Co.* v. *Lacy,* 165 Md. 588, 170 Atl. 190, 192; *Mitchell* v. *Branch,* 45 Haw. 128, 139, 363 P.2d 969, 977. It is immaterial whether the jury concluded that defendant's negligence was the sole proximate cause or a concurring proximate cause of the death. The evidence would fully support either conclusion. The specification of error challenging the sufficiency of the evidence is therefore overruled.

We turn now to consider appellant's claim that the trial court committed error in giving Court's Instructions No. 2 and No. 16, as they related to the definition of "a concurring proximate cause," and in refusing to give Defendant's Requested Instruction No. 20.

Court's Instruction No. 2 was an extremely long one. In addition to the law on causation, it covered other specific principles of law applicable to the facts of the case. As far as pertinent to the issue under consideration, the instruction provided:

"I further instruct you that before you can bring in a verdict of guilty you must be convinced beyond a reasonable doubt of the truth of all of the following: (a) that the Defendant was negligent, (b) that his negligence was either the sole proximate cause of the death of Charles Herbert Karlstad, or a concurring proximate cause of the death of Charles Herbert Karlstad, and (c) that all of the other material elements of the offense charged, as I have earlier set them forth, have been proved.

"A proximate cause of an event such as death is that cause which in a natural and continuous sequence produces the death and without which the death would not have occurred. Negligence may be a proximate cause of an event such as death. There may be more than one proximate cause of an event such as death.

In that case the proximate causes are known as concurring proximate causes.

"Since in this case evidence was admitted relating to whether the deceased was negligent and whether the deceased's negligence was a proximate cause of his death it is necessary that I instruct you as to the law that applies in the case of the different factual situations that you may find. Please remember again that you are the exclusive judges of the facts, and that what I say is not to be considered by you as any intimation by me as to what your findings of fact should be.

"I instruct you that the legal doctrine known as contributory negligence, which has application in civil cases, has no application in a criminal case.

"This means that if you find beyond a reasonable doubt that the Defendant was negligent, that Defendant's negligence was a concurring proximate cause of the death and that all of the other material elements of the offense, as I have earlier set them forth, have been proved, then it makes no difference if you also find that the deceased was negligent and that the deceased's negligence was a concurring proximate cause of his death. Your verdict must still be guilty.

"On the other hand if you find by a mere preponderance of the evidence that the deceased was negligent and that the deceased's negligence was the sole proximate cause of his death, then your verdict must be not guilty. This is because any finding by you that the deceased's negligence was the sole proximate cause of his death necessarily excludes any finding by you that the Defendant's negligence (assuming you find the Defendant to have been negligent) was either the sole proximate cause or a concurring proximate cause of the death. Hence an essential element of the State's case would be missing."

Appellant's specification of error alleges that it was error to give the instruction "in that it was impossible for a jury of ordinary intelligence to understand and apply the law as given by said Instruction No. 2 to the facts of the case." However, the specification fails to set forth the objections urged at the trial as is required by Rule 3 (b) (4) of this court. This deficiency in itself would warrant our refusal to review the instruction. *Kealoha* v. *Tanaka*, 45 Haw. 457, 463, 370 P.2d 468, 472; *State* v. *Pokini*, 45 Haw. 295, 297, 367 P.2d 499, 501.

Further, the portion of the transcript referred to in the specification of error does not show any specific objection to the definitions of "proximate cause" or "concurring proximate cause," set forth in Court's Instruction No. 2. From the transcript it appears that the objection made to the Court's Instruction No. 2 amounted to no more than a general one to the effect that the instruction was misleading, indefinite, incomplete and ambiguous. In order to predicate error on an objection of that nature it is necessary that the objecting party offer a clarifying instruction. As far as the Court's Instruction No. 2 is directly concerned, no such instruction has been brought before us. For this additional reason the instruction is not directly subject to review. "Where an instruction on a particular point or points as given by the court is correct as far as it goes, and the only valid objection, if any, to it is that it is deficient or inadequate by reason of its generality, indefiniteness, or incompleteness, if accused desires additional, amplified, explanatory, fuller, or more complete, elaborate, comprehensive, definite, specific, or explicit instructions on such point or points, he must properly request the same, otherwise error cannot be assigned to the instruction as given. * * * Where an instruction is ambiguous, or is likely to mislead or confuse the jury, the remedy of accused is to ask for an explanatory instruc-

tion removing the fault in question." 23A C.J.S., *Criminal Law*, § 1326, pp. 854, 860. See *Ginoza* v. *Takai Elec. Co.*, 40 Haw. 691, 710; *Sylva* v. *Wailuku Sugar Co.*, 19 Haw. 602, 609.

The transcript reveals that during the course of arguing on the instruction defense counsel stated: "I believe that the instructions as proposed by the defendant, which will be taken up later, regarding proximate cause, are the proper instructions to give in the State of Hawaii." Defendant's instructions referred to have not been identified and whatever action was taken on them has not been assigned as error. As far as Court's Instruction No. 2 is concerned, we do not regard the record as revealing the offer of a clarifying instruction.

However, during the course of deliberation the jury requested the court to: "Please explain in simple layman's language the meaning of 'concurrent proximate cause.'" The court prepared its Instruction No. 16, reading as follows:

"The law draws a distinction between a proximate cause and a remote cause. As I have previously explained to you, in law 'A proximate cause of an event such as death is that cause which in a natural and continuous sequence produces the death and without which the death would not have occurred.'

"I realize that you desire a definition of proximate cause in laymen's language. The difficulty in complying with your request is that I must give you the full legal definition, which I have done. What you must do is to take this definition, and after considering all of the facts and circumstances in this case determine whether or not the State has proven beyond a reasonable doubt that the Defendant was negligent, that the Defendant's negligence was either the sole proximate cause or a concurring proximate cause of the death,

and that all of the other essential elements of the offense as I have previously given them to you have been proved.

"There is nothing mysterious about a concurring proximate cause. As I have previously stated there may be more than one cause of an event such as death.

"If these causes operate at the same time they are concurring causes. If they are all proximate, as well, they are concurring proximate causes.

"This instruction must be read together with all the other instructions I have given to you. If after a careful consideration of this instruction, you still do not understand it, please let me know."

Counsel for the defendant objected to the instruction on the ground it was a mere repetition of Court's Instruction No. 2, that it still left the matter of proximate and concurrent causes indefinite, uncertain and ambiguous, and that it failed to cover "the law enunciated in the Federal case [*Greyhound Corp.* v. *Sparks, supra*] that I gave to the Court, which it is the defendant's position correctly states the law." He urged that the defendant was entitled to an instruction "based primarily on the ground of my motion for judgment for acquittal, and also the ruling and the law as set forth in the Federal case, * * * because it does set forth what they are really concerned with, and that is that if the defendant used due care when the deceased came onto the highway, could the defendant have avoided the accident? That is the key to the case." The court directed defendant's counsel to submit a written request for an instruction, framed to meet his objections and contentions. As a result, counsel presented Defendant's Requested Instruction No. 20, reading:

"If you find from the evidence beyond a reasonable doubt that the deceased was negligent in the manner in which he emerged his automobile onto the highway

and if you also find that the defendant if proceeding at the lawful rate of speed when the deceased drove onto the highway could have avoided the accident by the use of ordinary care, then you are instructed that the negligence of both the deceased and the defendant were a concurring proximate cause of the accident.

"On the other hand if you find from the preponderance of the evidence that even if the defendant was proceeding at a lawful rate of speed when the deceased emerged onto the highway, the defendant could not by the use of ordinary care have avoided the accident then you are instructed the negligence of the defendant was not a concurring proximate cause of the death of Charles Herbert Karlstad.

"The word 'concurring' means 'together'—the words 'proximate cause' mean the act that produced the death of the deceased.

"Therefore, if you find from the evidence beyond a reasonable doubt, that the defendant and the deceased were both negligent, then by applying the law as above stated, you can also determine whether, beyond a reasonable doubt, the negligence of defendant was a concurring proximate cause. If you should so find your verdict should be guilty as charged, if you do not so find, your verdict should be not guilty."

The court refused the requested instruction and read its Instruction No. 16 to the jury.

There was nothing erroneous in the coverage of "proximate cause" and "concurring proximate cause" as originally given in the Court's Instruction No. 2. The instruction defines the essential features of those terms. 5A Am. Jur., *Automobiles,* § 236, p. 370; 65 C.J.S., *Negligence,* § 103, p. 645, and § 110, p. 674; *Mitchell* v. *Branch, supra,* 45 Haw. 128, 363 P.2d 969; *Hutchinson* v. *Mitchell,* 143 W. Va. 280, 101 S.E.2d 73, 75; *Oneil* v. *Sea Bee Club,*

69 Ohio L. Abs. 442, 118 N.E.2d 175, 177; *Reilly* v. *Buster,* Tex. Civ. App., 52 S.W.2d 521, 524; *Frank* v. *Stiegler, supra,* 250 Minn. 447, 84 N.W.2d 912, 918. And we think the explanation of causation given by the court should have been understood by a jury of ordinary intelligence provided sufficient effort were made on its part to study the instruction. The court's resubmission by its Instruction No. 16 of the principles on causation covered by its Instruction No. 2 in effect directed the jury to make further effort to understand them. The course taken by the trial court appears to us to have been proper and reasonable. However, if Instructon No. 16 could be deemed incomplete, indefinite or uncertain, it was, as has been shown, incumbent upon the defense to present a proper instruction to cure the purported deficiency. Defendant's Requested Instruction No. 20 did not accomplish that objective.

The only new point presented by Defendant's Instruction No. 20 which had direct pertinency to the meaning of "concurrent proximate cause" was contained in the third paragraph thereof, defining the word "concurring" as meaning "together." The point was, however, as adequately, if not more adequately covered by the inclusion in the Court's Instruction No. 16 of the provision reading: "If these causes [proximate causes] operate at the same time they are concurring causes."

We are satisfied that when the Court's Instructions No. 2 and No. 16 are considered with the remainder of the charge that the jury was adequately and fairly charged on all aspects of the law applicable to the case, and that no error has been shown in respect to the charge unless appellant is correct in his contention that he was entitled to have the jury given the first two paragraphs of his Requested Instruction No. 20.

The theory underlying appellant's argument in sup-

port of the first two paragraphs of Instruction No. 20 is basically the same as that upon which it is urged a fatal defect existed in the State's case by reason of the failure of the prosecution to have proven that if the defendant had been traveling at 35 miles per hour he could have, by exercise of ordinary care, stopped his car in time to avoid the collision. As is stated in one of appellant's briefs: "Defendant's Requested Instruction No. 20 properly projected the *Greyhound* rule for the jury. No. 20 gave the jury an attempted answer to its question. The word 'attempted' is used because, due to the failure of proof by the prosecution as discussed under Argument I, it was impossible for the jury to properly evaluate the facts in light of the law as no expert testimony was produced based upon which the jury could determine whether the accident could have been avoided if Arena were traveling within the speed limit and using ordinary care." "Argument I" (on the sufficiency of the evidence) was premised on the basis and argued from the standpoint that: "There is not an iota of evidence that if appellant 'had been traveling at the lawful rate of speed, he could have stopped his vehicle at a point somewhere within the 135-foot distance.'" We have already rejected the argument that "the rule of the *Greyhound* case" was applicable in determining the issue on the sufficiency of the evidence and we are also of the opinion that it affords no support for the claim that the court committed error in refusing Defendant's Requested Instruction No. 20.

The application of "the rule of the *Greyhound* case" to this case, both in respect to the issue on the sufficiency of the evidence and the ruling disallowing Defendant's Requested Instruction No. 20, necessitates acceptance of the proposition, as a starting point, that it is not possible to stop an automobile traveling at 35 miles an hour within a distance of 135 feet or that it is questionable whether

such could be done. For the reasons stated below, we find the proposition wholly untenable.

The use of the automobile today is so widespread that there are many features in connection with it that are common day experiences and are therefore subject to judicial notice without necessity of proof. *"Motor Vehicles* have become of such general use and form so large a part of the daily lives and experiences of the people that judicial knowledge may be taken of those prominent facts in regard to them or their operation which are a part of the common knowledge of every person of ordinary understanding and observation. Accordingly, judicial notice has been taken of matters of common knowledge pertaining to * * * starting and stopping cars * * *." 31 C.J.S., *Evidence,* § 81, pp. 674-676. See also Annot., 84 A.L.R.2d 979, on *Evidence — Car — Stopping Distance.*

Some appellate courts have gone as far as to take cognizance of available tables to determine or aid in the determination of the distance in which an automobile traveling at a given rate of speed can be stopped after the operator has reacted to the observation of a condition which called for the immediate application of brakes. The Fifth Circuit Court of Appeals did so in *Autrey* v. *Swisher,* 5 Cir., 155 F.2d 18. Relying on a table prepared by the Traffic Engineering & Safety Department, American Automobile Association, the court in that case concluded and stated (at p. 22): "These physical facts indicate that the car was traveling at a relatively high speed when the impact took place after it had skidded 111 feet with all four-wheel brakes locked. A car running 50 miles an hour may be stopped in 111 feet; 60 miles an hour, in 160 feet."

In *Wilson* v. *Williams,* La. App., 82 So.2d 71, the court stated at p. 75: "Using the stopping distance table set forth in Blashfield's *Cyclopedia of Automobile Law*

*and Practice,* Section 9237, Volume 9C, page 413, it appears that at 30 m.p.h., an automobile of average braking efficiency should stop in 40 feet from the time the brakes are applied; and at 40 m.p.h., in 71 feet from time brakes are applied." The court noted parenthetically (at p. 75): "We realize such tables are useful only as rough general guides, since exact stopping distances depend on the individual efficiency of the brakes and the condition of the stopping surfaces, etc." Several other Louisiana cases in which the same or similar charts were resorted to are cited in *Smith* v. *Northern Ins. Co.,* La. App., 120 So.2d 309, at p. 312.

In *Rodi* v. *Florida Greyhound Lines, Inc.,* Fla., 62 So.2d 355, it is stated at p. 358: "* * * this court can take judicial notice from established and widely publicized calculations, that a car travelling at the lawful speed of 50 miles per hour needs [inclusive of the distance covered by reaction time] 166 feet in which to come to a stop under optimum conditions."

Other jurisdictions refuse to consider such tables without testimonial authentication. See *Archer* v. *Aristocrat Ice Cream Co.,* 87 Ga. App. 567, 74 S.E.2d 470, 473; *McCoy* v. *Gilbert,* 110 Ohio App. 453, 169 N.E.2d 624, 632; *Lemons* v. *Holland,* 205 Ore. 163, 286 P.2d 656, 660. In the last cited case the court states at p. 660: "Unquestionably, this chart [Blashfield's] is based upon experiments conducted with different motor vehicles and drivers at different times and places. As a general proposition, the information on the chart might be of value in the driving education of motor vehicle operators, but it serves no purpose in a case such as this. The figures on the chart are not evidence in this litigation, nor could the chart itself have been admitted in evidence. Insofar as this case is concerned, the information given is pure hearsay."

We do not find it necessary to adopt one or the other

of the above views in this case. For our purposes, disposition of the point under consideration can be made on the basis, as stated and followed in the cases hereunder considered, that as a matter of common knowledge a court may take judicial notice that under normal conditions an automobile may be stopped within certain distance limits.

In *Smith* v. *Hardy*, 228 S.C. 112, 88 S.E.2d 865, the court refused to recognize Blashfield's table on stopping distances but stated (at p. 870): "Of course, there are maximum limits that are matters of common knowledge." To the same effect is *Highfill* v. *Brown*, Mo., 340 S.W.2d 656, in which the court states (at p. 664): "We have said often that we do not take judicial notice of the exact distance in which an automobile may be stopped at a given speed, but that we may, nevertheless, take judicial notice that an automobile may be sufficiently slowed or stopped within certain distance limits." See also *Muse* v. *Page*, 125 Conn. 219, 4 A.2d 329, 332.

In *Weitzman* v. *Bissell Lumber Co.*, 193 Wis. 561, 214 N.W. 353, the court held (at p. 356): "It is matter of common knowledge that a car traveling at this rate of speed [28 miles per hour] can be stopped at a much less distance than 85 feet when the brakes are in proper order."

In *Goldsmith* v. *St. Paul Mercury Indemnity Co.*, La. App., 123 So.2d 797, without considering any table as was done in the other Louisiana decisions above referred to, the court stated at p. 799: "Further, we may assume that if Goldsmith had been traveling at 30 miles per hour, with allowance for reaction time, he could have stopped within 83 feet."

In *Noland* v. *Pastor*, 8 Cir., 191 F.2d 1009, the court held, at p. 1013: "That a driver going thirty miles an hour can make a swerve of more than ten inches and can sound a horn, or even apply brakes and stop within a

much shorter distance than 100 feet, is a matter of such common knowledge as to be obvious. The court must take judicial notice of it."

See also *Wright* v. *Chicago, R. I. & P. R. Co.*, 222 Iowa 583, 268 N.W. 915, 916; *Dister* v. *Ludwig*, 362 Mo. 162, 240 S.W.2d 694, 698.

There is no direct testimony in the record on the condition of the roadway at the scene of the collision but the photographs in evidence reveal that it was paved, dry, and without grade. There is no intimation in the record that the brakes of defendant's car were not functioning properly. Therefore, in accordance with the last considered authorities, we are of the opinion that we can take judicial notice that if Arena's car had been traveling at or near the legal rate of 35 miles an hour, in the exercise of ordinary care he would have been able to stop it well within the 135 feet of his skid marks. Consequently, it is our conclusion that there was not only a lack of a factual basis upon which to predicate the first two paragraphs of Defendant's Requested Instruction No. 20, but to have given them would have injected a false and misleading factor into the case for the jury's consideration.

Appellant's claim of error in respect to the instructions is also overruled and the judgment is affirmed.

*Myer C. Symonds* (*Bouslog & Symonds* of counsel) for defendant-appellant.

*John H. Peters*, Prosecuting Attorney, City and County of Honolulu, and *Herbert H. Tanigawa*, Deputy Prosecuting Attorney, for the State, plaintiff-appellee.

# STATE OF HAWAII *v.* LARRY TAMANAHA.

## No. 4288.

MARCH 1, 1963.

TSUKIYAMA, C.J., CASSIDY, WIRTZ,
LEWIS AND MIZUHA, JJ.

*Per Curiam.* There is nothing presented under the petition for rehearing filed herein that was not heretofore considered by the court in reaching its decision of December 10, 1962, except a matter relating to the establishment of a point system for the evaluation of the operating records of all persons operating motor vehicles under Act 113, Session Laws of Hawaii, Regular Session of 1961. Under this Act "relative values to the various violations of the traffic laws of the State and of traffic ordinances of its counties" were assigned as follows:

"(1) Heedless and careless driving_____3 to 6 points

     \*      \*      \*      \*      \*      \*      \*

"(9) Inattention to driving;

        negligent driving_____1 to 4 [points]"

The Act does not specifically refer to the statutes or ordinances in question. It can safely be assumed, however, that "heedless and careless" driving, as set forth in the Act refers to the offense set forth in R.L.H. 1955, § 311-1. An examination of the Revised Laws of Hawaii 1955, as amended, discloses no statute relating to "inattention to driving; negligent driving" and such must be covered by county ordinance, if at all. No such ordinance has been called to our attention and we are not permitted to take judicial notice of county or city and

county ordinances on this subject if they exist. *Territory v. Yoshikawa,* 41 Haw. 45.

Petitioner contends in his petition for rehearing that:

"By the above assignment of points and by the wording of the offenses, it indicates a legislative intent to make the offense of careless driving an offense which requires more than mere negligence as the standard of conduct as compared to inattention to driving which denotes the requirement of mere negligence."

It is extremely difficult, if not impossible, to impute to the legislature the power to breathe the intent into the expressed language of a related though wholly independent legislative body. At best, Act 113 is inconclusive as nowhere therein is set forth the standard of conduct required for either of the offenses above referred to. While it may be true that there is an ordinance[1] defining inattention to driving which sets up a standard of ordinary negligence as determinative of such offense, so does the plain language of the heedless and careless driving statute, R.L.H. 1955, § 311-1. Act 113 merely indicates an intent on the part of the legislature to treat, for the purpose of imposing points, the statutory offense of heedless and careless driving as requiring more reprehensible conduct than the offense of inattention to driving as covered by ordinance.

Even if we were able to glean from Act 113 that the legislature enacting it intended to ascribe to heedless and careless driving, R.L.H. 1955, § 311-1, a standard of conduct requiring more than ordinary negligence and what is commonly referred to in the law as gross or criminal negligence, still we would be unable to disregard the plain and clearly expressed statutory language of R.L.H. 1955, § 311-1 adopted by a previous legislature.

---

[1] *Cf.,* R.L.H. 1955, § 149-86 (48).

*Greenstein, Yamane & Cowan (Ernest Y. Yamane)* for the petition.